**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROCHELLE GLASGOW, *et al.*, | ) | CASE NO. 5:21-cv-2001 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| RONALD BEERS, *et al.* | ) | |
| | ) | **ORDER** |
| Defendants. | ) | |
| | ) | |

On November 14, 2022, Plaintiffs[1] filed their First Amended Complaint against

Defendants Gospel Light Mennonite Church Medical Aid Plan Inc. doing business as Liberty

Healthshare ("Liberty"), Medical Cost Savings Solution LTD doing business as Medcost

Solutions, LLC ("MCS"), Cost Sharing Solutions LLC ("CSS"), SavNet International LLC

("SavNet"), Daniel J. Beers, Ronald Beers, Daniel Beers Jr., Druzilla J. Abel, Thomas Fabris,

Brandon Fabris, Douglas D. Behrens, and Dale E. Bellis. (R. 76, PageID# 993-996, ¶¶19-32).

It is alleged in the Amended Complaint that the corporate forms of Defendants CSS,

MCS and SavNet are shams, as they are alter-egos of individually named defendants and the

---

[1] The named Plaintiffs are three private individuals who reside outside of the State of Ohio. (R. 76, PageID# 992-993, ¶¶16-18). The Ohio Attorney General is listed as a "nominal Plaintiff." (R. 76). The complaint includes class action allegations, and "proposed class is defined as 'all current and former participants in Liberty plans from 2013 forward (the "Class Period") who fulfilled their responsibility to make periodic payments to Liberty to participate in plans presented as HCSMs.'" (R. 76, PageID# 1028, ¶140).

corporate veil should be pierced. (R. 76, PageID# 1025, ¶ 132). The Amended Complaint alleges the following eight counts: (1) breach of contract and covenant of good faith and fair dealing against Defendant Liberty; (2) money had and received against all Defendants; (3) unjust enrichment against Defendant Liberty; (4) civil RICO [Racketeer Influenced and Corrupt Organizations Act] action against the four Corporate Defendants and Defendant Daniel J. Beers; (5) conversion against all Defendants; (6) breach of fiduciary duty against Defendant Liberty; (7) intentional, or alternatively, negligent misrepresentation against Defendant Liberty; and (8) an accounting against Defendant Liberty.

On November 23, 2022, Defendants Thomas Fabris, Brandon Fabris, Daniel J. Beers, Daniel Beers II, Ronald Beers, MCS and CSS (collectively "Vendor Party Defendants") moved to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). (R. 79). The Vendor Defendants contend that a Settlement Agreement entered between them and the Ohio Attorney General (OAG) render the claims in the First Amended Complaint moot. (R. 79). Specifically, the Vendor Defendants assert that Plaintiffs lack standing because their claims are allegedly redressed by the Settlement Agreement. (R. 79, PageID# 1159-1163; R. 79-1, Exh. A).

On December 12, 2022, Defendant Liberty also filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) raising essentially the same argument as the Vendor Defendants and asserting that Plaintiffs' claims were moot in light of a settlement agreement Defendant Liberty reached with the OAG. (R. 86-1, PageID# 1254-1275; R. 86-3, Exh. A-1).

On the same date, Defendants Abel and Bellis filed a motion to dismiss raising a number of arguments, including the argument that the Court lacks subject matter jurisdiction due to the

2

alleged mootness of Plaintiffs' claims.[2] (R. 85-1).

## I. Factual Allegations of the Complaint

Plaintiffs allege that Defendant Liberty and the other Defendants purported to operate a faith-based healthcare sharing ministry ("HCSM"). (R. 76, PageID #53, 65). Generally, Plaintiff describes HCSMs as medical cost-sharing organizations where members of the same religious faith pay a premium or "contribution" to the HCSM, which then ostensibly redistributes the premiums to cover medical costs. (R. 76). Plaintiffs allege that Defendant Liberty materially misrepresented that "the plans being offered were legitimate and legal HCSMs that would provide medical coverage, rather than the illegal and fraudulent contrivance they actually were, the true purpose of which was to circumvent state and federal insurance laws in a scheme to funnel money collected as premiums or 'contributions' to Liberty that were subsequently redirected to the Affiliated Defendants." *Id*. at PageID# 1012-1013, ¶92. According to the Amended Complaint, Defendant Liberty claims to serve over 80,000 households, totaling more than 230,000 individuals nationwide. (R. 761, PageID# 990, ¶9). In a nutshell, Plaintiffs alleges as follows:

> Liberty's scheme is simple in concept. As a registered non-profit 501(c)(3) business and self-proclaimed faith-based "cost-sharing" agent for the payment of medical expenses, Liberty portrays the illegal health insurance it sells as HCSM plans—even though Liberty and the plans plainly do not meet the requirements under federal and state law for HCSMs—in an illegal scheme devised to avoid otherwise applicable federal and state law, including limitations on the percentage of premiums that can be diverted to purposes other than the payment of benefits.

---

[2] Defendants Abel and Bellis' motion also argues that Plaintiffs' conversion claim fails under Virginia law because (1) the money Plaintiffs seek is not a segregated fund, and (2) they do not have a right to immediate possession. (R. 85-1, PageID# 1207-1209). It is further argued that Plaintiffs' Money Had and Received Claim fails because their conversion claim fails. (R. 85-1, PageID# 1210-1211). Defendants' brief also asserts that Plaintiffs' claims also fail because they are premised on Abel's and Bellis's status as former officers or directors of Defendant Liberty. *Id*. at PageID# 1212-1213).

*** 

> Liberty's scheme has proven to be an extremely lucrative—but illegal—arrangement by which its principals have amassed millions of dollars in illegal profits. Rather than pay the covered medical procedures and bills incurred by Plaintiffs and the other Class Members, which it was required to do, Liberty funneled the money collected as premiums or "contributions" to itself and its principals through affiliated for-profit entities so as to further circumvent and violate federal and state law limiting the distributions, profits, and compensation paid to non-profit principals.

(R. 76, PageID# 989-990, ¶¶7-8). Despite holding itself out as an HCSM, it is alleged that Liberty is actually an unlicensed insurer because it fails to meet federal and state requirements for the exception. (R. 76, PageID# 1003, ¶57). Further, it is alleged that "[i]n furtherance of Liberty's scheme to illegally divert the premiums it collected to the Affiliated Defendants, Liberty has regularly and routinely delayed and denied payment on claims that are covered by the plans." *Id*. at PageID# 1014, ¶97.

## II. Fed. R. Civ. P. 12(b)(1) Standard

The three aforementioned motions seeking to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) all allege that the claims raised by Plaintiffs have been rendered moot by Settlement Agreements entered between Defendants and the OAG. (R. 79, PageID# 1159; R. 85, PageID# 1213; R. 86-1, PageID# 1254). Defendants are correct that a suit must allege a live controversy.

A federal court's exercise of judicial power under Article III of the Constitution depends on the existence of a live case or controversy, and, thus, mootness is a jurisdictional question. *Demis v. Sniezek*, 558 F.3d 508, 512 (6th Cir. 2009) (c*iting Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990)). In a recent decision, the Sixth Circuit Court of Appeals has observed as follows:

Article III, § 2 of the United States Constitution vests federal courts with jurisdiction to address "actual cases and controversies." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 458 (6th Cir. 2004) (citing U.S. Const. [A]rt. III, § 2). Federal courts are prohibited from rendering decisions that "do not affect the rights of the litigants." *Id.* (citing *Southwest Williamson Cty. Cmty. Assoc. v. Slater*, 243 F.3d 270, 276 (6th Cir. 2001)). A case becomes moot "when the issues presented are no longer live or parties lack a legally cognizable interest in the outcome." *See Cleveland Branch, N.A.A.C.P. v. City of Parma, Ohio*, 263 F.3d 513, 530 (6th Cir. 2001) (*quoting Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979)). **The "heavy burden" of demonstrating mootness falls on the party asserting it**. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs (TOC), Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000).

*Thomas v. City of Memphis*, 996 F.3d 318, 323-24 (6th Cir. 2021) (emphasis added);

*accord Moss v. Lee*, No. 3:21-cv-00561, 2022 WL 68388, 2022 U.S. Dist. LEXIS 2727,

at *5-6 (M.D. Tenn. Jan. 6, 2022).

### III. Analysis

It appears to be undisputed that the OAG, in a *parens patriae* capacity, launched an investigation into the dealings of Liberty HealthShare and most other named Defendants in the Complaint resulting in two aforementioned Settlement Agreements, though Plaintiffs assert the settlements are not "public records" and do not satisfy the criterion for taking judicial notice. (R. 89, PageID# 1342-1344 ).

The Settlement Agreement between the OAG and Daniel J. Beers, CSS, Daniel Beers II, Ronald Beers, Brandon Fabris, MCS, Thomas Fabris, Barat Consulting, and Scott Barat contains the following clause:

Upon receipt of payment in full of the Costs and Fees Amount, the Payments, and the Civil Penalty, … the Attorney General, in his role as parens patriae to protect intended beneficiaries of charitable trusts including, but not limited to, current and former members of Liberty HealthShare, hereby agrees to fully and completely release the Vendor Parties for any and all acts or omissions from any and all claims and causes of action of any nature or any kind, both known and unknown, arising from or related to the Charitable Investigation or the Potential Claims and

5

Causes of Actions occurring prior to the Effective Date [December 10, 2021].

(R. 79-1, PageID# 1175; Exh. A).

A *separate* Settlement Agreement was entered between the OAG and the National

Coalition of Health Care Sharing Ministries, Inc., Liberty, Druzilla Abel, Dale Bellis, and Larry

Foster. (R. 86-3, PageID# 1280, Exh. A-1). That agreement contains language stating that

"[c]onditioned upon and subject to full and complete material performance of their obligations

under this Agreement, the Attorney General hereby fully and completely releases Abel, Bellis,

and Foster from any and all claims, and causes of action of any nature or any kind, both known

and unknown, arising from the Charitable Investigation for any acts and/or omissions in their

capacity as Board Members and/or Officers of Gospel Light or the National Coalition." (R. 86-3,

PageID# 1297). Similar language in the agreement granted a conditional release to Gospel Light.

*Id*.

Plaintiffs counter that the Settlement Agreements between the Defendants and the OAG

have no bearing on this Court's jurisdiction. (R. 89, PageID# 1344-1353). Plaintiffs expressly

challenge the notion that a lone state attorney general can extinguish the personal damage claims

of 230,000 individuals across the nation, the purported class.[3] *Id*. The Court agrees that

Defendants' position is rather novel, and the Court declines to adopt such a position without

clear and unambiguous precedent. None of Defendants' various motions to dismiss based on an

alleged lack of jurisdiction due to mootness acknowledge the "heavy burden" they must carry to

---

[3] The Court need not decide at this early stage whether the OAG had the authority to settle the claims of potential class members who reside in or are citizens of the State of Ohio. Rather, the only issue that needs to be decided at this point is whether the OAG's settlement with the Defendants mooted the claims of the four non-Ohio Plaintiffs and other potential national class members who are not Ohio citizens.

demonstrate that the claims in the Complaint are moot. Furthermore, the dispositive issue is not whether the OAG has the authority to institute a *parens patria* action,[4] to investigate charities or to prevent wrongdoing by charitable organizations that operate in Ohio,[5] or whether the OAG acted within his authority to enter into a set of settle agreements with the Defendants. Rather, the only issue that need be decided at this time is whether the OAG has the authority to settle the claims of a potential national class comprised of numerous non-Ohioans, including the three named Plaintiffs, none of whom reside in Ohio. As discussed below, none of the cases cited by the moving parties hold that a single state's attorney general may extinguish the claims of a national class. Therefore, Defendants' have failed to carry their heavy burden to show the present controversy is moot.

## A. *Parens Patriae* Actions

Many of the cases cited by Defendants merely discuss *parens patriae* actions generally

---

[4] Whether the OAG had standing to initiate a *parens patriae* action against Defendants is not a dispositive issue. The cases cited by Defendants that merely set forth the standing requirements for *parens patriae* actions do not aid Defendants' motions to dismiss this action as moot. *See, e.g., In re Suwinski*, 509 B.R. 568, 573 (Bankr. S.D. Ohio 2013) ("To have standing under the doctrine of *parens patriae*, the governmental entity must establish the following elements: (1) the state must have a quasi-sovereign interest, apart from the interests of particular private parties; and (2) there must be an injury to a substantial segment of its population.")

[5] The cases and statutes cited by Defendants for the general and obvious proposition that the government, in this case the OAG, has an important interest in stopping wrongdoing by charitable organizations do not advance Defendants' argument that this controversy is moot. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2386, 210 L. Ed. 2d 716 (2021) ("It goes without saying that there is a 'substantial governmental interest[ ] in protecting the public from fraud.'") (citations omitted); *Brown v. Concerned Citizens for Sickle Cell Anemia, Inc.*, 382 N.E.2d 1155, 1158 (Ohio 1978); Ohio Charitable Organizations Act, O.R.C. § 1716.01 *et seq*.; Ohio Charitable Trust Act, O.R.C. § 109.23 *et seq*.

and do not support their mootness argument.[6] *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607, 102 S. Ct. 3260, 3268, 73 L. Ed. 2d 995 (1982) (stating that "in order to maintain [a *parens patriae* action], the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party. The State must express a quasi-sovereign interest."); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266, 92 S. Ct. 885, 893, 31 L. Ed. 2d 184 (1972) (holding that while "[p]arens patriae actions may, in theory, be related to class actions, … the latter are definitely preferable in the antitrust area."); *Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 773 (9th Cir. 1994) ("State governments may act in their parens patriae capacity as representatives for all their citizens in a suit to recover damages for injury to a sovereign interest…. There is a presumption that the state will adequately represent the position of *its* citizens) (emphasis added). None of these cases suggest that a single state attorney general may settle an action on behalf of a nationwide class of individuals who do not reside in the state and whose interests are unrepresented.

Defendants' reliance on *Alaska Sport Fishing* is also misplaced. That case involved a private Alaska-based fishing association and four individual sportfishers seeking damages for loss of use and enjoyment of natural resources resulting from the 1989 Exxon Valdez oil spill. 34 F.3d at 770. In March 1991, the United States and the state of Alaska had filed suit against Exxon in their capacities as "trustees for the public." *Id*. at 771 (the two governments subsequently entered into a nearly billion dollar settlement agreement and consent decree with Exxon, which the district court approved in 1991). The *Alaska Sport Fishing* case involved an

---

[6] The Vendor Defendants' motion is particularly bare when it comes to citing on-point authority on the issue of *parens patriae* actions and how they relate to national class actions. (R. 79).

action seeking damages for the loss of the use of the State of Alaska's natural resources, a case that is not even remotely similar to the present action where a potentially national group of Plaintiffs, all of those named are out of state, seek to recover their own monetary damages as participants in Defendants' alleged scheme. "A *parens patriae* action cannot be brought to collect the damage claim of one legally entitled to sue in his own right." *Pfizer, Inc. v. Lord*, 522 F.2d 612, 616 (8th Cir. 1975). In addition, Plaintiffs herein do not seek to vindicate a public right or seek recovery of the loss of a natural resource that is confined to the state of Ohio. Another notable difference is that *Alaska Sport Fishing* involved both the state and federal governments in the settlement. Indisputably, the latter is more capable of serving as a representative of the national interest..

Similarly, the California state court case cited by Defendants is also easily distinguishable. *See Citizens for Open Access to Sand & Tide, Inc. v. Seadrift Ass'n*, 60 Cal. App. 4th 1053, 71 Cal. Rptr. 2d 77 (1998). This case involved an action instituted by a public interest group against a coastline property owners association seeking to vindicate a public right of a recreational easement on the property. *Id*. Years before the litigation, the California Coastal Commission, the Department of the Interior, acting on behalf of the United States, California's State Lands Commission, the Attorney General of the State of California, and the County of Marin entered into a settlement agreement with Seadrift property owners. *Id*. at 1060. The state court dismissed on *res judicata* grounds. Again, this matter is notably different for the same reasons as stated above in relation to the *Alaska Sport Fishing* case.

Defendants' cited cases generally have little bearing on the issue at hand. Again, the Court need not decide whether the OAG had authority to investigate the actions of Defendants, or whether the OAG had the authority to enter into the Settlement Agreements. Rather, the only

issue before the Court is whether a live controversy exists. To reach that issue, the Court only needs to decide whether a lone state attorney general, such as the OAG, has the authority to bind the three named Plaintiffs, who are non-Ohio residents, and the *national* class they purport to represent. Therefore, case law that merely discusses the general authority of a state attorney general to bring suit on behalf of the residents of their respective states sheds little light on the issue herein.

"[T]he common law right of the states to sue as parens patriae on behalf of the general welfare of their people, has not traditionally included suits for monetary damages." *State v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1169 (N.D. Cal. 2007) (*citing Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. at 600-07 (1982). "As the Supreme Court has held, when consumers are parties in interest to a case in which the State is the sole plaintiff and has not brought the action as a class action (or when the action is not a mass action), the parens patriae case's similarity to those types of actions does not warrant courts analyzing all such cases as if they were the same." *Sharp Elecs. Corp. v. Hitachi, Ltd. (In re Cathode Ray Tube (CRT) Antitrust Litig.)*, 27 F. Supp. 3d 1015, 1026 (N.D. Cal. 2014) (*citing Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 167 (2014)).

The Court also finds instructive a decision from the District Court of Maryland.

The class presently includes Troncelliti, and all others similarly situated, who purchased the Minolta Maxxum or AF–Tele products and resided within the states of Alabama, Georgia, Hawaii, Idaho, Louisiana, Maine, Michigan, Mississippi, Montana, Oklahoma, Rhode Island, South Carolina, Tennessee, and Wyoming (those States not included in the thirty-six parens patriae suits) at the time of purchase, and all other persons, who are not natural persons, including all proprietorships, partnerships, corporations, and other entities who purchased at retail a Maxxum or AF–Tele, but excluding (i) any federal, state, and local government purchasers, (ii) any unnamed co-conspirator, and (iii) defendants or any subsidiary or affiliate of defendants or any manufacturer of cameras. This suit is the subject of a Settlement Agreement, with terms identical to those reached

10

> between the States and Minolta in the parens patriae actions, and will now be
> considered by the Court. This settlement contemplates that the class will be
> comprised of residents in those fourteen states that did not file a parens patriae
> lawsuit and those other entities who made purchases as described above.

*Troncelliti v. Minolta Corp.*, 666 F. Supp. 750, 751 (D. Md. 1987). While the issue before the

*Troncelliti* court was whether a settlement between the class and Defendants was fair,

reasonable, and adequate, implicit in the court's decision is that there was no impediment to the

settlement of a national class action comprised of individuals from those states where AGs did

*not* initiate *parens patriae* actions. Though unclear whether the issue was ever raised, the

*Troncelliti* court clearly did not contemplate that any of the thirty-six *parens patriae* suits,

individually or collectively, would bar the claims of individuals who resided in states where no

*parens patriae* action was taken. *See also, Washington v. Chimei Innolux Corp.*, 659 F.3d 842,

848 (9th Cir. 2011) (In discussing the differences between *parens patriae* and class actions,

noting that a statutory *parens patriae* action "may well result in a settlement that does not

include restitution to victims of the fraud, but only results in penalties paid to the public

treasury.").

The Vendor Defendants' brief in support of its motion, in arguing that the OAG has

authority to oversee charities in the State of Ohio, acknowledges that the OAG "bears the

responsibility of representing the interests of class members **in the state**." (R. 79, PageID# 1160)

(emphasis added).[7] Absent any binding or persuasive authority, it does not follow that the OAG

---

[7] It further bears noting that, in making this statement, the Vendor Defendants rely on an easily
distinguishable case—*Thornton v. State Farm Mut. Auto Ins. Co.*, No. 1:06-CV-00018, 2006 WL
3359482 at **2-3 (N.D. Ohio Nov. 17, 2006). The *Thornton* lawsuit concerned improperly titled
salvage vehicles leading State Farm to enter into an Assurance of Voluntary Compliance with the
attorney generals of 49 out of 50 states, including Ohio's. *Id.* at **1-2. Therein, the plaintiff
purported to represent a class composed solely of "Ohio residents who have been sent notice of
their entitlement to participate in State Farm's settlement with the Ohio Attorney General; who

is empowered by state law to settle the private claims of out-of-state class members.

As stated above, Defendants' assertion that Plaintiffs' claims are moot places a heavy burden on Defendants to demonstrate that mootness. In this Court's view, the Defendants' position—that a lone state attorney general can settle the private, monetary claims of a nationwide class of Defendants—is rather novel and extraordinary. Defendants' inability to point to a single case to support such a proposition leaves them miles short of meeting that heavy burden.

**B. *Res Judicata***

Defendant Liberty and Defendants Abel and Bellis have separately argued that Plaintiffs' claims are barred by *res judicata*, asserting that the aforementioned settlement agreements constitute a final, valid, adjudication on the merits. (R. 85, PageID# 1213-1214; R. 86-1, PageID# 1265). This line of argument is derivative of their *parens patriae* argument, and merely rehashes the rejected claim that the causes of action asserted in the First Amended Complaint are moot due to the settlement agreements with the OAG.

Defendant Liberty posits that Ohio's rules on the application of *res judicata* apply, and sets out the following four elements: "(1) a prior suit litigated to a final, valid decision on the merits; (2) the same parties as in the prior suit, or their privies; (3) a second suit that raises claims that 'were or could have been litigated' in the prior suit; and (4) claims in the second suit that 'aris[e] out of the transaction or occurrence that was the subject matter' of the prior suit."

---

have not opted into the AG settlement." In the case at bar, none of the three named Plaintiffs are Ohio residents, and the potential class is national in scope rather than statewide. Further, there is no indication that any other state AG has entered into a settlement agreement with Defendants. Therefore, the Vendor Defendants' repeated reliance on *Thornton* is misplaced. (R. 79, PageID# 1160, 1162-63).

*Talismanic Properties, LLC v. City of Tipp City, Ohio*, 742 Fed. App'x 129, 131 (6th Cir. 2018) *quoting Ohio ex rel. Boggs v. City of Cleveland*, 655 F.3d 516, 510 (6th Cir. 2011). (R. 86-1, PageID# 1268).

The *res judicata* argument fails for the same reason as the Defendants' mootness argument—the named Plaintiffs and the purported nationwide class were not parties to the settlement agreement entered between Defendants and the OAG, and the OAG was not Plaintiffs' privy. Defendant Liberty asserts that "[w]hat constitutes privity in the context of *res judicata* is somewhat amorphous" under Ohio law, and "mutuality of interest" can be sufficient. (R. 94, PageID# 1662, quoting *Brown v. Dayton*, 89 Ohio St.3d 245, 248, 730 N.E.2d 958 (Ohio 2000)). The Court declines to find that sufficient mutuality of interest occurs where Defendants point to no clear and unambiguous authority suggesting that the OAG, or any single state attorney general, could litigate and settle the private, monetary claims of non-resident Plaintiffs and a purported nationwide class.

**C. Count Five: Conversion**

Defendants Abel and Bellis argue that Plaintiffs' First Amended Complaint fails to state a conversion claim against them because under Virginia law:[8] (1) the money Plaintiffs seek to recover is not a segregated or identifiable fund; and, (2) Plaintiffs have no immediate right to possess the money they paid to Liberty. (R. 85-1, PageID# 1207-1209).

> Conversion is "any wrongful exercise or assumption of authority ... over another's goods, depriving him of their possession; and any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *Mackey v. McDannald*, 298 Va. 645, 842 S.E.2d 379, 387 (2020) (citation omitted, cleaned up). Although a claim for conversion "typically applies only to tangible property," Virginia law does recognize a claim for conversion of

---

[8] Plaintiffs' opposition brief does not contest that Virginia law applies, and cites Virginia cases to argue Defendants' argument is unavailing. (R. 93, PageID# 1558).

> "intangible property rights that arise from or are merged with a document, such as a valid stock certificate, promissory note, or bond"—but to establish such claim, the plaintiff "must have both a property interest in and be entitled to immediate possession of the documented intangible property." *Id*. (quotation marks and citations omitted). "The tort of conversion can also apply to money, including settlement proceeds wrongfully withheld." *Grayson v. Westwood Buildings L.P.*, 300 Va. 25, 859 S.E.2d 651, 679 (2021). However, "[u]nder Virginia law, money can only be the subject of a conversion claim in limited circumstances, including when it is part of a segregated or identifiable fund." *Northstar Aviation, LLC v. Alberto*, 332 F. Supp. 3d 1007, 1020 (E.D. Va. 2018) (internal quotation marks and citation omitted).

*Student A v. Liberty Univ., Inc.*, 602 F. Supp. 3d 901, 914 (W.D. Va. 2022); *Alberto*, 332 F. Supp. 3d at 1020 ("A segregated or identifiable fund is one separate from the defendant's general funds and one to which plaintiff is entitled.") Defendants assert Plaintiffs' First Amended Complaint fails to satisfy this required element of a conversion claim, because it does not identify segregated funds. (R. 95, PageID# 1671). Defendants point to language in the Amended Complaint stating that Defendant Liberty "make[s] payments to members from a *pool of money*"). *Id*., citing R. 76, ¶72 (emphasis added).

Defendants' argument conflates the general operating funds of a business or institution that such an entity utilizes for any purpose with the "pooled funds" that Plaintiffs allege were specifically set aside for Liberty's members for their eligible medical expenses. Plaintiff cites some of the same cases relied upon by Defendants Abel and Bellis, and notes that "courts have recognized that a complaint sufficiently states a conversion claim where, as here, the complaint alleges that a defendant converted money from a corporate bank account for personal use." *NorthStar Aviation, LLC*, 332 F. Supp. 3d at 1020 (*citing Opportunities Dev. Grp., LLC v. Andruss*, 2015 WL 2089841, at *9 (E.D. Va. Apr. 30, 2015) (holding that plaintiff adequately plead a claim of conversion where complaint alleged that defendants converted monies from plaintiff's business bank account for personal use)). The Amended Complaint alleges that the

14

individual defendants, which would include Abel and Bellis,[9] "contrived, formed, and operated Liberty and its affiliated enterprises as a means to obtain exorbitant illegal payments and profits … and they misused and continue to misuse Liberty to cause consumers like Plaintiffs and Class Members to pay thousands or tens of thousands of dollars in premiums each year that were and are then funneled to Liberty and its principals." (R. 76, PageID# 1012, ¶91).

The Amended Complaint sufficiently alleges that the purported class paid contributions, dues, and/or premiums into a pool for which there was an expectation that they would receive money from that pool for medical costs incurred if the need arose. Defendant Liberty denies being an insurer, therefore, the money collected is arguably not part of general operating funds of an insurer, but rather money segregated or set aside for the benefit of Liberty's members—the purported class. As in *NorthStar Aviation, LLC*, the allegation that Defendants Abel and Bellis improperly funneled money from Defendant Liberty to themselves or to other entities in which they or members of their family held an interest is sufficient to state a cause of action in conversion against them under Virginia law.

Nevertheless, Defendants Abel and Bellis also argue that Plaintiffs do not have a right to immediate possession of the monthly contributions they paid to Defendant Liberty, nor have they alleged such a right. (R. 85-1, PageID# 1207-1209, R. 95, PageID# 1673-1674, *citing Jones v. Bank of Am. Corp.*, 2010 WL 6605789, at *5 (E.D. Va. Aug. 24, 2010) ("To maintain a claim for conversion, the plaintiff must have a property interest in the item allegedly converted and be 'entitled to the immediate possession of the item.'") (*quoting Economopoulos v. Kolaitis*, 259 Va. 806, 528 S.E.2d 714, 719 (Va. 2000)).

---

[9] The Court notes that only the individual Defendants Abel and bellis have filed a motion to dismiss the conversion claim on these grounds.

Conversely, Plaintiffs point to cases applying Virginia law on conversion where conversion claims were allowed to proceed even though an immediate right of possession was not apparent. In *Raleigh Radiology, Inc. v. Eggleston & Eggleston, P.C.*, 2009 WL 3764092, at *4 (W.D. Va. Nov. 10, 2009), a federal court applying Virginia law found that an allegation that a plaintiff had a right to its funds at the moment of the alleged conversion was sufficient to deny a motion to dismiss. In *Amazon.com, Inc. v. WDC Holdings LLC*, No. 20-1743, 2021 WL 3878403, at *6 (4th Cir. Aug. 31, 2021), a defendant asserted that Amazon's conversion claim was not viable because Amazon could not make a claim for immediate possession of any specific funds. The Fourth Circuit was unpersuaded and found that a defendant need not be a direct recipient of converted funds for a plaintiff to establish a conversion claim under Virginia law. *Id.*, citing *Fed. Ins. Co. v. Smith*, 63 Fed. App'x 630, 632–33 (4th Cir. 2003) ("wronged party can recover money converted if the possessor did not receive it in good faith or for valuable consideration, even if the money has changed forms").

Given the level of ambiguity on this issue in Virginia law, the Court declines to dismiss the conversion action for failure to state a claim where Plaintiffs have plainly alleged facts that, if construed as true, could establish that the moving Defendants did not receive the money in good faith or for valuable consideration.

**D. Count Two: Money Had and Received Claim**

Defendants Abel and Bellis argue that Plaintiffs' claim for money had and received against them fails for reasons similar to their argument concerning conversion. (R. 85-1, PageID# 1210). Under Virginia law, "an action of Money Had and Received exists whenever one has money of another which he has no right to retain and which defendant is obligated by natural justice and equity to refund." *Studco Bldg. Sys. U.S., LLC v. 1st Advantage Fed. Credit*

16

*Union*, 509 F. Supp. 3d 560, 574 (E.D. Va. 2020) (*quoting Hartford Fire Ins. Co. v. First Union Nat'l. Bank*, 45 Va. Cir. 279, 1998 WL 972158, at *2 (Va. Cir. Ct. Apr. 1, 1998)). "[F]ederal and state courts in Virginia have held that a cause of action for Money Had and Received is indistinguishable from Conversion, codified at Va.Code § 8.3A-420. " *Id*. at 575. Defendants' argument is premised entirely on their above arguments against the conversion claim. (R. 85-1). Similarly, Plaintiffs' response to this argument is combined with their response concerning the conversion claim. (R. 93, PageID# 1558-1561).

Because the Court has determined that Plaintiffs' conversion claim is sufficiently plead, Defendants Abel and Bellis's motion to dismiss Count Two is not well taken.

**E. Claim that Liberty is a Valid HCSM**

Defendants Abel and Ellis also contend that Plaintiffs' claims for conversion and money had and received separately fail because they hinge on Liberty not being a properly recognized HCSM. (R. 85-1, citing R. 76, ¶¶ 168, 171, 217). These Defendants assert that in 2014, the Centers for Medicare and Medicaid Services ("CMS"), which is part of Health and Human Services, determined that Gospel Light satisfied the applicable legal standards to "be considered a health care sharing ministry" under the Affordable Care Act, including the requirements that its members "share a common set of ethical or religious beliefs" and that Gospel Light or a predecessor has been in continual existence since December 31, 1999. (R. 85-1, PageID# 1205, *citing* R. 85-2, Exh. 1, March 31, 2014 Letter from CMS to Gospel Light at PageID# 1218).[10]

Defendants selectively quote the letter from CMS, whose review was apparently based on

---

[10] The Amended Complaint alleges that also in 2014, "Liberty merged with Gospel Light … and Gospel Light began operating as Liberty. (R. 76, PageID# 1002, ¶ 52.)

documents submitted by Gospel Light, the veracity of which the Court shall not assume for purposes of a Rule 12(b)(6) motion. (CMS Letter, R. 85-2, PageID# 1218). CMS also indicated that Gospel Light was required to notify CMS within 30 days if "any change in your status or operation affects any of the information you have submitted to CMS for the purpose of requesting consideration as a health care sharing ministry pursuant to 45 CFR 155.615(c)(2)." *Id*. Thus, any argument that Gospel Light, and by extension Defendant Liberty, enjoyed HCSM status in perpetuity or for the entire duration of the alleged suit is undermined by CMS's cautionary language that Gospel Light must continue to comply with the requirements and inform CMS of any changes. Assuming *arguendo* that Defendant Liberty did not continue to meet the requirements of a HCSM, as alleged in the Amended Complaint, Defendant Liberty's status as a valid HCSM remains a question of fact.

The letter from CMS also states as follows:

This determination is limited to Gospel Light Mennonite Church Medical Aid Plan's compliance with standards relevant to an organization being considered a health care sharing ministry for the purposes of subpart G of 45 CFR part 155. As such, *this determination does not supersede other relevant state or federal laws that govern the conduct of Gospel Light Mennonite Church Medical Aid Plan. Furthermore, this determination does not reflect any decision by the Internal Revenue Service regarding Gospel Light Mennonite Church Medical Aid Plan's status as a health care sharing ministry or compliance with the Internal Revenue Code.* Gospel Light Mennonite Church Medical Aid Plan should not inform its members or the general public that this determination provides any such rights or status other than those rights which flow from an organization being considered a health care sharing ministry for the purposes of subpart G of 45 CFR part 155, which relate strictly to an individual's eligibility under 45 CFR 155.605(d) to obtain from a Health Insurance Marketplace a certificate of exemption from the individual shared responsibility payment under section 5000A of the Internal Revenue Code.

(R. 85-2, Exh. 1, PageID# 1218) (emphasis added). Given the express language of the letter, the Court agrees with Plaintiffs that the CMS Letter strictly limits its determination for the purposes

of an individual's eligibility for an exemption from the healthcare exchange, and it is not dispositive of any issue in this lawsuit.

Alternatively, the Court finds that Plaintiff's conversion and money had and received claims are not based solely on their assertion that Defendant Liberty was not a *bona fide* HCSM, but also on their allegations that their monthly "contributions" paid to Defendant Liberty were intended for "medical expenses and the medical expenses of other Class Members and to pay for the *reasonable administration costs* of the plans." (R. 76, PageID# 1045, ¶¶170, 217) (emphasis added). Instead, the Amended Complaint alleges that Defendants violated their duty to maintain these funds for proper purposes and, wrongfully and without authority, redirected these contributions or significant portions thereof to themselves or the principals of the named Defendants, including the moving Defendants Abel and Bellis. *Id*. at ¶¶ 170, 217-221. In other words, assuming *arguendo* that Defendant Liberty was a valid HCSM at all relevant times, such a fact would not be dispositive. Defendants have cited no authority suggesting that a valid HCSM is incapable of committing the tort of conversion or immune from such a cause of action. Moreover, the moving Defendants, Abel and Bellis, are not HCSMs and they have cited no authority suggesting that they derive any immunity from being officers of such an entity.

**F. Claims Against Abel and Bellis as Officers or Directors of Defendant Liberty**

Defendants Abel and Bellis assert that Plaintiffs' claims against them fail because the allegations against them are "based merely on their status as former officers or directors of Defendant Liberty." (R. 85-1, PageID# 1212). They contend that under Virginia law, "[i]t is well-established that, in general, an individual corporate officer or director is not subject to personal liability simply by virtue of his office[.]" *Id*., citing *Stafford Urgent Care, Inc. v. Garrisonville Urgent Care, P.C.*, 224 F. Supp. 2d 1062, 1065 (E.D. Va. 2002); *Bright Imperial*

*Ltd. v. RT Media Solutions, S.R.O.*, 2012 WL 1831536, at *11 (E.D. Va. May 18, 2012) ("[M]erely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation.") (quotation and citation omitted)).

Defendants maintain that the First Amended Complaint's allegations are insufficient, alleging that the complaint consists merely of statements that Abel and Bellis were founders of Liberty, former directors or officers of Liberty, or being a lifelong friend, family member, or former business partner of other individuals named as defendants. (R. 85-1, PageID# 1213). Defendants acknowledge that Plaintiffs allege "in conclusory fashion" that unidentified "Defendants and their principals used the payments from Plaintiffs and Class Members for their own purposes and profits and to pay for the administrative costs of running their business, but not for providing the actual services that were advertised (e.g., coverage for medical bills), as required by law." *Id.*, citing R. 76, ¶170. Nevertheless, Defendants assert that Plaintiffs set forth no facts to plausibly allege that either Abel or Bellis should be individually liable to them for conversion or money had and received. (R. 85-1, PageID# 1212-1213).

Plaintiffs respond that Defendants Abel and Bellis are not only former officers or directors of Liberty, but rather the creators and leaders of Liberty's fraudulent scheme, and they correctly point out that "[c]orporate officers may of course be liable jointly and severally with their corporation for obligations arising out of tortious conduct of the officers that subject the corporation to liability." *Sit-Set, A.G. v. Universal Jet Exch., Inc.*, 747 F.2d 921, 929 (4th Cir. 1984) (citing generally Restatement (Second) of Agency § 343 (1957)); *accord Trans-Radial Sols., LLC v. Burlington Med., LLC*, No. 2:18-CV-656, 2019 WL 3557879, at *5 (E.D. Va. Aug. 5, 2019) ('a corporate officer is not liable for the corporation's contractual obligations, but such officer may be jointly and severally liable for fraud if 'the corporate office directly engaged in

the transaction ... [for] which liability was found.").

The Court also agrees that Defendants fail to read the First Amended Complaint as a whole. Said complaint sufficiently alleges that Defendants Abel and Bellis were part of a scheme to deprive and deplete the pool of contributions made by the purported class members by redirecting said funds to themselves, to family members, or to other businesses in which they had an interest.

Previously, this Court, in the context of a civil RICO action, has observed that "[a]n inability to describe the exact inner workings" of an alleged criminal enterprise, association, or fraudulent scheme is not dispositive at the 12(b)(6) stage, as discovery is necessary sometimes to shed light on such issues. *In re Nat'l Prescription Opiate Litig.*, No. 1:18-OP-45090, 2018 WL 4895856, at *18 (N.D. Ohio Oct. 5, 2018), *report and recommendation adopted in part, rejected in part*, No. 1:17-MD-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018). Furthermore, while Plaintiffs have not alleged a free-standing fraud claim, the general allegations of the Amended Complaint allege a fraudulent scheme and misrepresentations by Defendants collectively. (R. 76).

In *Williams v. Duke Energy Intern., Inc.*, the Sixth Circuit Court of Appeals stated:

[T]his court has held that "[i]t is a principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery. Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988). "Especially in a case in which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control." *Id.*

681 F.3d 788, 803 (6th Cir. 2012). Other decisions from this district support the notion that "Rule 9's pleading requirement of particularity must be read in harmony with Rule 8's 'policy of

21

simplicity in pleading[.]' [and] ... courts should not be 'too exacting' or 'demand clairvoyance from pleaders' in determining whether the requirements of Rule 9(b) have been met." *See, e.g., Ford v. Pa. Higher Educ. Assist. Agency*, 2018 WL 1377858 at *4 (N.D. Ohio Mar. 19, 2018) (Lioi, J.) (citations omitted).

While Defendant Bellis asserts the Complaint is bereft of specific allegations against him, his brief ignores that Bellis is alleged to have appeared on a national television show and asserted that "[w]e've had a successful history of sharing medical bills 100% for every eligible need ever submitted. . . .[,]" a misleading and illusory statement according to the Amended Complaint. (R. 76, PageID# 989, ¶6). It is also alleged that he is a founding member of Liberty (R. 76, PageID# 996, ¶31). Again, Defendant Bellis is among the "Individual Defendants" who allegedly "contrived, formed, and operated Liberty and its affiliated enterprises as a means to obtain exorbitant illegal payments and profits … and they misused and continue to misuse Liberty to cause consumers like Plaintiffs and Class Members to pay thousands or tens of thousands of dollars in premiums each year that were and are then funneled to Liberty and its principals." (R. 76, PageID# 1012, ¶91).

Most of these same allegations were made against Defendant Abel as well. (R. 76, ¶¶ 27, 91). In addition, it is alleged she failed to disclose her familial relationship to her brother Defendant Daniel J. Beers, who exercised control of MCS, CSS, and SavNet—all entities that were recipients of substantial funds from Defendant Liberty. (R. 76, ¶¶ 24, 111, 121). It is also alleged she concealed excess benefit transactions with a disqualified person as well as a concealed a business transaction with founder and former director Defendant Douglas Behrens in a Form 990. *Id*. at ¶¶110-114. It is further alleged that in the same Form 990 she falsely stated that she was unaware of a significant diversion of the organization's assets. *Id*. at ¶113.

Again, the Court reads the complaint as a whole, which sufficiently places Defendants Abel and Bellis on notice of their alleged involvement in the alleged conversion of Plaintiffs' contributions. Without the benefit of discovery, Plaintiffs cannot be expected to meticulously spell out the manner in which each defendant contributed to the alleged conversion of Plaintiffs' contributions.

### IV. Plaintiffs' Motion to Supplement the Complaint

On March 7, 2023, Plaintiffs filed a motion for leave to file a supplemental pleading pursuant to Federal Rule of Civil Procedure 15(d).[11] (R. 96). The supplement, however, is merely a purported news story regarding Defendants' purported operation of an HCSM. The Court cannot construe the substance of this article as an add-on to Plaintiffs' factual allegations. As an exhibit to the First Amended Complaint, it serves no purpose (but may be part of the discovery process), and finally Plaintiff makes no meaningful attempt to explain how the article is necessary to support their claims. Furthermore, it is unnecessary to the resolution of Defendants' various motions to dismiss, which the Court is denying by this very Order. Therefore, the Court denies Plaintiffs' motion for leave to file a supplemental pleading. Defendants' motions to strike (R. 97 & 98), filed in response to Plaintiffs' motion for leave, are hereby denied as moot.

---

[11] Pursuant to Rule 15(d):

> **Supplemental Pleadings**. On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

## V. Conclusion

For the foregoing reasons, the Vendor Party Defendants' motion to dismiss (R. 79) is DENIED; Defendant Liberty's motion to dismiss (R. 86) is DENIED; and, Defendants Abel and Bellis's motion to dismiss (R. 85) is DENIED. In addition, Plaintiffs' motion for leave to file a supplemental pleading (R. 96) is DENIED. Finally, Defendants' motions to strike (R. 97 & 98) are DENIED as moot.

IT IS SO ORDERED.

s/ *David A. Ruiz*

David A. Ruiz
United States District Judge

Date: March 20, 2024