# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| ROCHELLE GLASGOW, *et al.*, | CASE NO.   5:21-CV-02001 |
| Named Plaintiffs, | JUDGE DAVID A. RUIZ |
| vs. | |
| DANIEL J. BEERS, *et al.*, | |
| Defendants. | |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## REDACTED PUBLIC VERSION

Plaintiffs Rochelle Glasgow, William Rooker, and Donna Landry ("Plaintiffs"), by their undersigned counsel and pursuant to N.D. Ohio Civ. R. 23.1 and Rule 23 of the Federal Rules of Civil Procedure, hereby move this Court for class certification under Rule 23(a) and Rule 23(b)(3), and in support state the following:

Plaintiffs, on behalf of themselves and a class of persons similarly situated, move to certify their claims of (i) money had and received and conversion against all Defendants[1]; (ii) unjust enrichment against Liberty; and (iii) violations of 18 U.S.C. § 1962(c) (federal RICO claim) against Liberty, Daniel J. Beers, MCS, CSS, and SavNet.

Plaintiffs move for certification of a class of individuals defined as: All purchasers of Liberty healthcare plans from 2013 to present (the "Proposed Class").

---

[1] Defendants are Gospel Light Mennonite Church Medical Aid Plan, Inc. DBA Liberty HealthShare ("Liberty"), Medical Cost Savings Solution LTD doing business as Medcost Solutions, LLC ("MCS"), Cost Sharing Solutions LLC ("CSS"), and SavNet International LLC ("SavNet") (Liberty, MCS, CSS, and SavNet are sometimes referred to collectively as the "Corporate Defendants"), as well as Daniel J. Beers, Ronald Beers, Daniel Beers, Jr. or II, Druzilla J. Abel, Thomas Fabris, Brandon Fabris, Douglas D. Behrens, and Dale E. Bellis (collectively, the "Individual Defendants," and, together with the Corporate Defendants, the "Defendants").

Plaintiffs also request that Plaintiffs' counsel be appointed to represent the certified class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.  This action satisfies all the prerequisites for maintenance of a class action, as set out in Federal Rule of Civil Procedure 23(a).  The class is sufficiently numerous to make joinder impracticable, there are questions of law and fact common to the class, Plaintiffs' claims are typical of the class, and Plaintiffs will fairly and adequately protect the interest of the class.  In addition, the questions of law and fact common to the class predominate over any issues affecting individual Class members, and the class action procedure is the superior method of resolving the claims and defenses in this action.

This action is appropriate for certification as a class action under Rule 23(b)(3). Common questions of law or fact for the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The only difference among members of the class would be the ministerial task of arithmetically calculating the pro-rata portion of total class damages and/or the Court's equitable class relief.  All were equally disadvantaged by the operation of Liberty as alleged.

WHEREFORE, Plaintiffs respectfully request this Court to:

(1)    grant Plaintiffs' Motion for Class Certification;

 (2)    certify a Class under Rule 23(b)(3) consisting of the following: All purchasers of Liberty healthcare plans from 2013 to present;

(3)    appoint Plaintiffs Rochelle Glasgow, Donna Landry, and William Rooker as Class Representatives; and

(4)    appoint Michael I. Fistel, Jr., William W. Stone, and Oliver S. tum Suden and their law firm, Johnson Fistel, PLLP, as well as George Cochran and his law firm, The Law Office of

George W. Cochran, to serve as Class Counsel under Rule 23(g) of the Federal Rules of Civil Procedure.

Respectfully submitted,

Dated: July 29, 2025

**JOHNSON FISTEL, PLLP**

By: */s/ Michael I. Fistel, Jr.*
MICHAEL I. FISTEL, JR.
WILLIAM W. STONE
OLIVER S. TUM SUDEN
40 Powder Springs Street
Marietta, Georgia 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com
WilliamS@johnsonfistel.com
OliverT@johnsonfistel.com

**LAW OFFICE OF GEORGE W. COCHRAN**
GEORGE W. COCHRAN (0031691)
1981 Crossfield Circle
Kent, Ohio 44240
Telephone: (330) 607-2187
Facsimile: (330) 230-6136
lawchrist@gmail.com

***Counsel for Plaintiffs and Proposed Class Counsel***

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

ROCHELLE GLASGOW, *et al.*,

                      Named Plaintiffs,

vs.

DANIEL J. BEERS, *et al*.,

                      Defendants.

CASE NO.   5:21-CV-02001

JUDGE DAVID A. RUIZ

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.  INTRODUCTION ........................................................................................................ 1

II.  STATEMENT OF FACTS ......................................................................................... 2

III.  PROCEDURAL HISTORY ....................................................................................... 5

IV.  ARGUMENT ............................................................................................................. 6

    A.  The Requirements for Class Certification Are Met ......................................... 6

    B.  The Proposed Class Satisfies the Prerequisites of Federal Rule of Civil Procedure 23(a) and 23(b)(3). ............................................................................................... 9

        1.  The Proposed Class Easily Satisfies the Numerosity Requirement. ..................... 10

        2.  Questions of Law and Fact are Common to Plaintiffs and the Class and Predominate Over Any Questions Affecting Only Individual Members. ................................. 11

            a.  Plaintiffs Have Identified A Common Question of Law or Fact. ................... 12

            b.  Common Questions Predominate Over Any Questions Affecting Only Individual Members ................................................................................ 13

                i.  Money Had and Received Against All Defendants .................................. 14

                ii.  Unjust Enrichment against Defendant Liberty ......................................... 17

                iii.  Civil RICO against Liberty, MCS, Cost CSS, SavNet, and Daniel J. Beers ...................................................................................................... 20

                iv.  Conversion Against All Defendants .......................................................... 31

        3.  Plaintiffs' Claims are Typical of the Claims of the Class .............................. 32

        4.  Plaintiffs Are Adequate Class Representatives Who Will Continue to Vigorously Prosecute the Interests of the Class Through Qualified Counsel. 33

    C.  A Class Action Is Superior to Numerous Individual Actions...………………….…34

V.  CONCLUSION .......................................................................................................... 36

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**CASES**

*Amchem Products, Inc. v. Windsor*,
  521 U. S. 591 (1997) ..................................................................................... 14, 35, 36

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ......................................................................................... 7, 8, 9, 23

*Avio, Inc. v. Alfoccino, Inc.*,
  311 F.R.D. 434 (E.D. Mich. 2015) .................................................................... 6

*Baltimore & Ohio Railroad Co. v. O'Donnell*,
  49 Ohio St. 489, 32 N.E. 476 (1892) ................................................................ 32

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008) ................................. 21

*Brown v. Electrolux Home Prods.*, Inc.,
  817 F.3d 1225 (11th Cir. 2016) ......................................................................... 11

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) ............................................................................. 13

*Castillo v. Morales, Inc.*,
  302 F.R.D. 480 (S.D. Ohio 2014)....................................................................... 10

*Cross v. Nat'l Trust Life Ins. Co.*,
  553 F.2d 1026 (6th Cir. 1977) ........................................................................... 34

*Davis v. Cintas Corp.*,
  717 F.3d 476 (6th Cir. 2013) ............................................................................. 7

*Doster v. Kendall*,
  54 F.4th 398 (6th Cir. 2022) .............................................................................. 11

*Gooch v. Life Investors Ins. Co. of Am.*,
  672 F.3d 402 (6th Cir. 2012) ............................................................................. 23

*H.J. Inc.* v. *Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989) ........................................................................................... 22, 23

*Helwig v. Concentrix Corp.*,
  345 F.R.D. 608 (N.D. Ohio 2024)...................................................................... 13, 14

*Hicks v. State Farm Fire and Cas. Co.*,
    965 F.3d 452 (6th Cir. 2020) ................................................................. 12

*In re Am. Med. Sys., Inc.*, 7
    5 F.3d 1069 (6th Cir. 1996) ........................................................... 10, 32

*In re Nat'l Prescription Opiate Litig.*,
    332 F.R.D. 532 (N.D. Ohio 2019) ................................................. 24, 25

*In re Nat'l Prescription Opiate Litig.*,
    976 F.3d 664 (6th Cir. 2020) ................................................................. 24

*In re Nissan NorthAmerica, Inc. Litig.*,
    122 F.4th 239 (6th Cir. 2024) ........................................................... 11, 13

*In re Scotts EZ Seed Litig.*,
    304 F.R.D. 397 (S.D.N.Y. 2015) ......................................................... 19

*In re Telectronics Pacing Sys., Inc.*,
    172 F.R.D. 271 (S.D. Ohio 1997) ........................................................ 36

*In re Welding Fume Prods. Liab. Litig.*,
    245 F.R.D. 279 (N.D. Ohio 2007) ....................................................... 34

*In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ............................................................ 7,12

*In re Williams*,
    233 B.R. 398 (Bankr. N. D. Ohio 1999) ............................................. 32

*James G. Davis Constr. Corp. v. FTJ, Inc.*,
    298 Va. 582, 841 S.E.2d 642 (2020) ................................................... 17

*Kirkpatrick v. J.C. Bradford & Co.*,
    827 F.2d 718 (11th Cir. 1987) .............................................................. 31

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ..................................................... 21, 30

*Lyngaas v. Curaden Ag*,
    992 F.3d 412 (6th Cir. 2021) .................................................. 6, 7, 8, 14

*Mackey v. McDannald*,
    298 Va. 645, 842 S.E.2d 379 (2020) ................................................... 31

*NorthStar Avaition, LLC v. Alberto*,
    332 F. Supp. 3d 1007 (E.D. Va. 2018) ................................................ 31

iii

*Partners & Friends Holding Corp. v. Cottonwood Mins. L.L.C.*,
653 F. Supp. 3d 344 (N.D. Tex. 2023) ................................................................. 15

*Partners & Friends Holding Corp. v. Cottonwood Mins. L.L.C.*,
No. 23-10192,
2023 WL 8649880 (5th Cir. Dec. 14, 2023).......................................................... 15

*Powers v. Hamilton County Pub. Defender Comm'n*,
501 F.3d 592 (6th Cir. 2007) ........................................................................... 6, 32

*Rikos v. Procter & Gamble Co.*,
799 F.3d 497 (6th Cir. 2015) ......................................................................... passim

*Sandusky Wellness Center, LLC v. ASD Specialty Healthcase, Inc.*,
863 F.3d 460 (6th Cir. 2017) ................................................................................ 14

*Sedima v. Imrex Co.*,
473 U.S. 479 (1985) .............................................................................................. 21

*Serrano v. Cintas Corp*,
No. 04-40132,
2009 WL 910702 (E.D. Mich. Mar. 31, 2009) ...................................................... 7

*Speerly v. Gen. Motors, LLC*,
No. 23-1940,
2025 WL 1775640 (6th Cir. June 27, 2025) .................................................8, 9, 11

*Sprague v. Gen. Motors Corp.*,
133 F.3d 388 (6th. Cir. 1998) .............................................................................. 32

*State Farm Fire & Cas. Co. v. Evans*,
956 So. 2d 390 (Ala. 2006) .................................................................................. 15

*Stephenson v. Family Solutions of Ohio, Inc.*,
No. 1:18-cv-2017,
499 F. Supp. 3d 467 (N.D. Ohio Nov. 4, 2020)..................................................... 8

*Sterling v. Velsicol Chem. Corp.*,
855 F.2d 1188 (6th Cir. 1988) ............................................................................. 12

*Studco Bldg. Sys. U.S., LLC v. 1st Advantage Fed. Credit Union*,
509 F. Supp. 3d 560 (E.D. Va. 2020)................................................................... 15

*Student A v. Liberty Univ., Inc.*,
602 F. Supp. 3d 901 (W.D. Va. 2022)................................................................... 31

*Szabo v. Bridgeport Machs., Inc.*,
249 F.3d 672 (7th Cir. 2001) ............................................................................... 11

iv

*Tedrow v. Cowles*,
  No. 2:06-cv-637,
  2007 WL 2688276 (S.D. Ohio Sept. 12, 2007) ........................................................ 7

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ........................................................................................ 14

*U.S. v. Jefferson Elec. Mfg. Co.*,
  291 U.S. 386 (1934) ........................................................................................ 15

*Uselmann v. Pop*,
  No. 19-cv-13652,
  2023 WL 584123 (E.D. Mich. Jan. 27, 2023) ........................................ 19, 22, 35, 36

*Walker v. Cedar Fair, L.P.*,
  No. 3:20-cv-2176,
  2023 WL 4564390 (N.D. Ohio July 17, 2023) ........................................................ 15

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................ 8, 12, 23, 29

*Williams v. Duke Energy Corp.*,
  No. 1:08-cv-46,
  2014 WL 12652315 (S.D. Ohio Mar. 13, 2014) ........................................ 10, 14, 29

*Young v. Nationwide Mut. Ins. Co.*,
  693 F.3d 532 (6th Cir. 2012) ................................................................................ 6, 10

## STATUTES, RULES AND OTHER AUTHORITIES

3 William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 3:29 (5th ed. 2011) ............... 33

18 U.S.C. § 1341 ........................................................................................................ 29

18 U.S.C. § 1343 ........................................................................................................ 29

18 U.S.C. § 1961(4) .................................................................................................... 20

18 U.S.C. § 1961(5) .................................................................................................... 21

18 U.S.C. § 1962 ........................................................................................................ 20

18 U.S.C. § 1962(a) .................................................................................................... 20

18 U.S.C. § 1962(c) ................................................................................................ 1, 20

18 U.S.C. § 1962(c)-(d) ............................................................................................ 21

26 U.S.C. § 5000A(d)(2)(B)(ii) .................................................................................... 3

v

Fed. R. Civ. P. 23...................................................................................................... passim

N.D. Ohio Civ. R. 23.1............................................................................................ 1, 13

VA ST § 38.2-6300...................................................................................................... 19

VA ST § 38.2-6301...................................................................................................... 19

Plaintiffs Rochelle Glasgow, William Rooker, and Donna Landry ("Plaintiffs"), by their undersigned counsel and pursuant to N.D. Ohio Civ. R. 23.1 and Rule 23 of the Federal Rules of Civil Procedure, hereby file this Memorandum of Law in support of their Motion for Class Certification.[1]  For the reasons set forth herein, this Court should certify a class of all purchasers of Gospel Light Mennonite Church Medical Aid Plan Inc. d/b/a Liberty Healthshare ("Liberty") healthcare plans from 2013 to present (the "Proposed Class" or "Class"); to appoint Plaintiffs to serve as Class representatives; and to appoint Johnson Fistel, PLLP and The Law Office of George W. Cochran to serve as Class counsel.

## I.    INTRODUCTION

This case is ideally suited for class treatment.  Plaintiffs seek relief on behalf of the Proposed Class comprised of hundreds of thousands of individual Class members who were damaged by their purchase of Liberty's fraudulent and worthless healthcare plans.  ¶140.[2] Defendants'[3] liability for the claims[4] Plaintiffs seek to certify on behalf of the Class can—and should—be determined in one action.

---

[1]  The page limitations of this Memorandum of Law have been modified by order of the Court dated July 22, 2025, which allowed Plaintiffs to file a Memorandum of Law in support of their Motion for Class Certification up to 40 pages in length.

[2] All references to "¶_") refer to Plaintiffs' First Amended Complaint (ECF No. 76) (the "Amended Complaint").  All exhibits are attached to the Declaration of Michael I. Fistel, Jr. in Support of Plaintiffs' Motion for Class Certification, filed concurrently herewith.

[3]  Defendants Liberty, Medical Cost Savings Solution LTD doing business as Medcost Solutions, LLC ("MCS"), Cost Sharing Solutions LLC ("CSS"), and SavNet International LLC ("SavNet") are referred to collectively as the "Corporate Defendants."  Daniel J. Beers, Ronald Beers, Daniel Beers, Jr. or II, Druzilla J. Abel ("Abel"), Thomas Fabris, Brandon Fabris, Douglas D. Behrens, and Dale E. Bellis ("Bellis") are referred to as the "Individual Defendants," and, together with the Corporate Defendants, the "Defendants").

[4]  Plaintiffs seek to certify the following claims on behalf of the Proposed Class: (i) money had and received and conversion against all Defendants; (ii) unjust enrichment against Liberty; and (iii) violations of 18 U.S.C. § 1962(c) (federal RICO claim) against Liberty, Daniel J. Beers, MCS, CSS, and SavNet.

If the claims Plaintiffs seek to certify are proven at trial, this Court would be justified in awarding Plaintiffs and all members of the Class full restitution of the funds conferred by them to Defendants. The only difference in damages between members of the Class would be the straightforward and ministerial task of arithmetically calculating the contributions, dues, and/or premiums paid by each Class member. Class action treatment is the only feasible way to vindicate the rights of the Class members because the relatively small nature of the Class members' individual claims at issue makes it extraordinarily unlikely that individual Class members could or would litigate these claims individually.

Discovery to date, which has been limited to that necessary for class certification,[5] includes, *inter alia*, scores of complaints to regulators demonstrating Liberty members reasonably believed they were getting a legitimate substitute for insurance. In exchange for their purchase of various tiers of coverage plans offered by Liberty, which were designed to mimic health insurance plans, members reasonably believed that Liberty would pay its members' "sharable" medical expenses. In truth, however, Plaintiffs and other Liberty members purchased a scam premised on purchasing coverage for "sharable" medical expenses for which Liberty has no obligation to reimburse.

## II. STATEMENT OF FACTS

Defendants have operated a purported healthcare sharing ministry ("HCSM") that sold or administered health plans to Plaintiffs and hundreds of thousands of other individuals across the country. Liberty, a non-profit corporation registered in Virginia, materially misrepresented that the Liberty was a legitimate HCSM and otherwise misled prospective members into believing they were purchasing a legitimate alternative to health insurance. The true purpose of the scheme was

---

[5] Case Management Order (ECF No. 123) (the "CMO").

to circumvent federal and state insurance laws, federal tax laws, and to deceive consumers in order to surreptitiously funnel money collected by Liberty as premiums or "contributions" to the Defendants for personal gain.

In truth, Liberty's healthcare plans offer no legitimate coverage for claims and Liberty fails to meet federal and state requirements for HCSMs.[6]  Liberty, which marketed itself as an HCSM, does not qualify as an HCSM under federal or state law because Liberty was formed after December 31, 1999, and has no valid predecessor entity.  Liberty misrepresented itself as a legitimate HCSM and otherwise misled prospective members into believing they were purchasing a legitimate alternative to health insurance.  Liberty's healthcare plans resemble traditional insurance in every material respect, including requiring monthly contributions or premiums, suspending membership for non-payment, offering tiers or coverage levels designed to mimic tiers of insurance coverage, requiring payments that function as insurance deductibles, mandating coverage limits, imposing preexisting condition requirements, and including various other terms designed to mislead consumers into believing they were purchasing a legitimate alternative to health insurance for covering "sharable" medical expenses.

The fraudulent intent of Liberty and its principals is demonstrated by their collection of millions of dollars in illegal profits through diverting funds collected as premiums to themselves and affiliated for-profit entities.  Liberty members' contributions have been squandered and stolen through self-dealing and undisclosed conflicts of interest, including Liberty's affiliated entities

---

[6]  For example, federal statutes provide that an entity can qualify as an HCSM only if it, or a predecessor to it, has "been in existence at all times since December 31, 1999" with medical expenses of its members having been "shared continuously and without interruption since at least December 31, 1999."  26 U.S.C. § 5000A(d)(2)(B)(ii).  ¶42.  Neither Liberty nor a predecessor to Liberty has been in existence at all times since December 31, 1999, and the medical expenses of Liberty's members have not been shared continuously and without interruption since then.  ¶56.

charging supra-market rates for services, as well as purported dispute resolution procedures designed to delay and deny payment on claims, furthering the scheme to illegally divert premiums to Defendants.

Defendants reaped illegal profits for the conspiracy and enterprise at members' expense by misusing the laws regarding HCSMs to avoid federal and state insurance laws (including those limiting the percentage of premiums retained for the insurer's own purposes), and by offering Plaintiffs and Class members what was effectively worthless and fraudulent healthcare coverage.[7] ¶50.  Through this scheme, Defendants profited from Liberty's significant monthly premiums without the corresponding responsibility for paying members' "sharable" medical expenses or complying with various regulations that would have ensured Liberty's financial stability .

Despite Liberty's designation as a nonprofit corporation, it conducted business through related entities and affiliated for-profit enterprises in an undisclosed and fraudulent scheme to surreptitiously funnel profits to Defendants.  The related entities and affiliated for-profit enterprises are illegal constructs of executives, board members and/or family members whose relationships with Liberty were not disclosed in order to charge over-market prices for services, thereby significantly eroding the portion of member contributions available for "sharing."  Neither were Liberty's arrangements with the Corporate Defendants the product of arm's length transactions. Instead, they were part of a larger self-dealing scheme to divert a portion of member premiums from its common fund to various principals for their personal enrichment (the very antithesis of Liberty's mission as a purported HCSM and charitable organization).  ¶115.

---

[7]  Although Liberty was not required to pay any medical expenses due to language in its standardized materials distributed to members, Liberty has on occasion gratuitously covered various medical expenses submitted by its members to keep the scheme going.

4

As class representatives, Plaintiffs seek to recover the fees charged to Class members pursuant to Defendants' unlawful scheme.  ¶131.  Plaintiffs also seek to pierce the corporate veil of the Corporate Defendants, which are alleged to be mere shells used to perpetrate the fraud for the personal benefit of the Individual Defendants.  ¶132.

## III.    PROCEDURAL HISTORY

This Action commenced on October 21, 2021.  ECF No. 1.  On September 30, 2022, following motion practice and briefing, the Court entered an Order dismissing without prejudice defendants Benjamin Beers, Rachel Beers, Matt Bellis, and Pamela Johnson from this action and denying the remaining motions to dismiss (ECF Nos. 36 and 41) without prejudice in anticipation of Plaintiffs filing an Amended Complaint.  ECF No. 72.

On November 14, 2022, Plaintiffs filed the Amended Complaint.   Following motion practice and briefing, on March 20, 2024, the Court entered an Order denying Defendants Bellis and Abel's joint motion to dismiss for failure to state a claim (ECF No. 85), denying the Vendor Party Defendants' motion to dismiss for lack of jurisdiction (ECF No. 79), and denying Liberty's motion to dismiss for lack of jurisdiction (ECF No. 86).  ECF No. 105.  Regarding Plaintiffs' claims brought on behalf of a nationwide class, the Court found that "[i]n this Court's view, the Defendants' position—that a lone state attorney general can settle the private, monetary claims of a nationwide class of Defendants—is rather novel and extraordinary.  Defendants' inability to point to a single case to support such a proposition leaves them miles short of meeting that heavy burden."  ECF No. 105 at 12, PageID #: 1936.  The Court further "decline[d] to find that sufficient mutuality of interest occurs where Defendants point to no clear and unambiguous authority suggesting that OAG, or any single state attorney general, could litigate and settle the private, monetary claims of non-resident Plaintiffs and a purported nationwide class."  *Id.* at 13, PageID #: 1937.

On July 12, 2024, following a status conference, the Court entered its CMO. Pursuant to the CMO, the parties have been engaged in discovery limited to discovery necessary for class certification.

## IV. ARGUMENT

### A. The Requirements for Class Certification Are Met

Rule 23(a) contains four initial prerequisites: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Next, one of Rule 23(b)'s alternative standards must be satisfied. *Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007). Plaintiffs seek certification pursuant to Rule 23(b)(3) because common questions of law and fact predominate over individual questions, and class treatment is superior to other available methods of adjudication. ¶147.

Finally, "although not explicitly stated in Rule 23 'the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.'" *Lyngaas v. Curaden Ag*, 992 F.3d 412, 428–29 (6th Cir. 2021) (citing *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537–38 (6th Cir. 2012)); *see also Avio, Inc. v. Alfoccino, Inc.*, 311 F.R.D. 434, 440–41 (E.D. Mich. 2015) ("In addition to the[] requirements spelled out directly in Rule 23, the existence of an ascertainable class of persons to be represented by the proposed class representatives is an implied prerequisite of Federal Rule of Civil Procedure 23.") (citation and quotation marks omitted).

When considering whether to grant class certification, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Rikos v. Procter & Gamble Co.*, 799

F.3d 497, 505 (6th Cir. 2015) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)) (internal quotations omitted); *In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*, 722 F.3d 838, 851–52 (6th Cir. 2013) ("[D]istrict courts may not turn the class certification proceedings into a dress rehearsal for the trial on the merits.") (internal quotations omitted).

Indeed, the Sixth Circuit "has never required a district court to decide conclusively at the class-certification stage what evidence will ultimately be admissible at trial," and "[n]umerous district courts" in the Sixth Circuit "have thus considered evidence at the class-certification stage that is reliable but that might ultimately be deemed inadmissible." *Lyngaas*, 992 F.3d at 429–30; *Tedrow v. Cowles*, No. 2:06-cv-637, 2007 WL 2688276, at *2–*3 (S.D. Ohio Sept. 12, 2007) (finding that "the rules of evidence are not to be applied strictly in deciding a motion for class certification," and thus rejecting a motion to strike where the defendants disputed the authenticity of the exhibit). "At this stage of litigation, the Court should consider all the evidence presented in support of and in opposition to class certification, and grant to the evidence the weight that the Court finds is most appropriate." *Lyngaas*, 992 F.3d at 429–30 (quoting *Serrano v. Cintas Corp*, No. 04-40132, 2009 WL 910702, at *3 (E.D. Mich. Mar. 31, 2009), *aff'd sub nom. Davis v. Cintas Corp.*, 717 F.3d 476 (6th Cir. 2013)).

This principle applies with particular force here because Plaintiffs have not been able to conduct merits discovery pursuant to the Court's CMO. For example, Liberty's sole basis for rejecting discovery requests regarding the scope of its conspiracy with certain defendants is that such documents "clearly go towards the merits of Plaintiffs' claims—not class certification."[8]

---

[8] "Plaintiffs are seeking documents relating to the scope or existence of the conspiracy alleged throughout [the Amended Complaint] (*See* Doc. # 76, PageID ## 1023–25, 1033, 1040–42). But the existence and scope of the alleged conspiracy clearly go toward the merits of Plaintiffs'

Given the obvious constraints of bifurcated discovery, unauthenticated exhibits such as the attached *ProPublica* articles help to even the playing field in meeting Plaintiffs' burden.[9]

On June 27, 2025—less than a week before class discovery closed in this action—the Sixth Circuit clarified this longstanding precedent.  In *Speerly v. Gen. Motors, LLC*, No. 23-1940, 2025 WL 1775640 (6th Cir. June 27, 2025), it cautioned that "district court[s] must not defer merits questions bearing on commonality and predominance until summary judgment," and provided the following rationale:

> In conducting a Rule 23 analysis, the district court will inevitably address issues that overlap with the merits inquiry. It "cannot be helped" that commonality and predominance's element-by-element, claim-by-claim inquiry implicates the merits of each claim. [*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)]; [*Amgen*, 568 U.S. at 465–66]. How else could the court assess the elements of Rule 23? While a free-ranging merits prediction—do the claimants have a weak or strong product liability case?—is "not properly part of the certification decision," the district court may—indeed, must—answer merits questions that bear on Rule 23's demands.  Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment.

> The district court, as a result, must not defer merits questions bearing on commonality and predominance until summary judgment. That kind of deferral concept is nowhere in Rule 23's text, which tells the court to refuse certification until it is assured that certification is proper.  Fed. R. Civ. P. 23(a)–(b).  The history of the Rules points in the same direction. The deferral possibility apparently grew out of a previous regime in which a district court could conditionally certify a class and prune the non-common, non-predominant issues later. But under the Rules

___

claims—not class certification."  Ex. 1 (Jan. 10, 2025 letter from counsel to Liberty to counsel for Plaintiffs).

[9]  At the class certification stage of the litigation, the Court is authorized to consider the attached *ProPublica* articles in determining whether to grant class certification regardless of the articles' ultimate admissibility.  *Lyngaas*, 992 F.3d at 428 (rejecting defendants' arguments that district court abused its discretion by relying on inadmissible and unauthenticated evidence to certify class); *Stephenson v. Family Solutions of Ohio, Inc.*, No. 1:18-cv-2017, 499 F. Supp. 3d 467, 475–76 (N.D. Ohio Nov. 4, 2020) (rejecting the defendants' motion to strike the plaintiffs' unauthenticated exhibits, reasoning that the court's inquiry at the class-certification stage is "tentative, preliminary, and limited") (citation and internal quotation marks omitted) (cited by *Lyngaas*, 992 F.3d at 429–30).

Enabling Act, the Judicial Conference and the Supreme Court considerably narrowed, if not eliminated, that option in 2003 when it barred conditional certification and mandated that a district court "refuse certification" until it is "satisfied that the requirements of Rule 23 have been met." *See* Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment. Postponing Rule 23 inquiries until everyone has joined the class runs the risk of avoiding an issue for 33 plaintiffs today in order to decide it for 800,000 tomorrow.

*Speerly*, 2025 WL 1775640, at *5.

Calling for restraint, the dissent characterized the majority opinion as decertifying the district court's decision to grant class certification on the basis that "the opinion concludes that [the p]laintiffs cannot secure relief on the merits of their state-law claims":

The majority opinion decertifies Plaintiffs' class and remands for a more careful and rigorous analysis, not because the district court's analysis was lacking, but because the opinion concludes that Plaintiffs cannot secure relief on the merits of their state-law claims. But the majority opinion should not be read to turn a peek under the hood into a full-blown diagnostic test. The Supreme Court has clearly cautioned against this type of searching merits analysis, and the district court should not engage in one on remand. *Amgen*, 568 U.S. at 466, 133 S.Ct. 1184.

*Speerly*, 2025 WL 1775640, at *63.  In the event the Court finds the materials Plaintiffs have submitted in connection with this Motion for Class Certification to be lacking, Plaintiffs respectfully request an opportunity to conduct merits discovery before a final decision on class certification is reached in light of (i) the Court's CMO limiting the first discovery phase in this action to discovery necessary for class certification and (ii) the new Sixth Circuit guidance in *Speerly* that "district courts must not defer merits questions bearing on commonality and predominance until summary judgment." *Id.* at *5.

**B.     The Proposed Class Satisfies the Prerequisites of Federal Rule of Civil Procedure 23(a) and 23(b)(3).**

Plaintiffs seek relief on behalf of a Class of all Liberty members who purchased Liberty healthcare plans from 2013 forward.  Under Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

As set forth below, each element of Rule 23(a)(1)-(4) has been satisfied in this case.

### 1.    The Proposed Class Easily Satisfies the Numerosity Requirement.

The hundreds of thousands of Class members would make joinder impossible, satisfying the requirement for numerosity.  Plaintiffs must show their proposed "class is so numerous that joinder of all members is impracticable." F.R.C.P. 23(a)(1).  Although there is no strict numerical test for determining impracticability of joinder, "[w]hen class size reaches substantial proportions . . . the impracticability requirement is usually satisfied by the numbers alone." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)  (citations omitted).  The Sixth Circuit has found even classes of 35 to be sufficient to meet this requirement.  *See Young*, 693 F.3d at 542; *Castillo v. Morales, Inc.*, 302 F.R.D. 480, 487 (S.D. Ohio 2014) ("Often, 'a class of forty or more members is sufficient to meet the numerosity requirement.'").

As of the date of filing the Amended Complaint, there were "over 220,000 [Liberty] members."  ¶143.  It would be impractical for the Court to require joinder of each of the over 200,000 Liberty members.  This would be overwhelmingly impractical, unnecessary, and difficult to manage.  Accordingly, the numerosity element weighs heavily in favor of class certification.  ; *Williams v. Duke Energy Corp.*, No. 1:08-cv-46, 2014 WL 12652315, at *13 (S.D. Ohio Mar. 13, 2014) (finding allegation of "hundreds of thousands of disfavored ratepayers" reasonable when considering the size of Duke's business in Ohio and "easily satisfies the numerosity requirement.").

2.    **Questions of Law and Fact are Common to Plaintiffs and the Class and Predominate Over Any Questions Affecting Only Individual Members.**

The Sixth Circuit recently held district courts must take the following two-step approach when making commonality and predominance inquiries:

> Rule 23 demands that the court conduct a structured two-step approach to assess commonality and predominance. ***Step one***: check to see that the plaintiffs have identified a "common question of law or fact." Fed. R. Civ. P. 23(a)(2). To be common, a question must (1) yield a common answer with common evidence and (2) meaningfully progress the lawsuit. The decisionmaker must be able to resolve the question with "a yes-or-no answer for the class in one stroke." *Doster v. Kendall*, 54 F.4th 398, 430–31 (6th Cir. 2022), vacated as moot, —— U.S. ——, 144 S. Ct. 481, 217 L.Ed.2d 248 (2023) (quotation omitted). The district court must actually decide whether the questions are common, *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676–77 (7th Cir. 2001), meaning that it cannot "accept [allegations] as true or construe [evidence] in anyone's favor," *Brown v. Electrolux Home Prods.*, Inc., 817 F.3d 1225, 1234 (11th Cir. 2016). If a reasonable decisionmaker left with the evidence may answer "yes" to a question for some class members and "no" for others, the class has not shown that it is common. *Doster*, 54 F.4th at 430–31; [*In re Nissan NorthAmerica, Inc. Litig.*, 122 F.4th 239, 252 (6th Cir. 2024)].
>
> Even then, not every question with a common answer meets Rule 23(a). Else, the fact that every customer sued GM about a GM car would create a common question suitable for class certification. The plaintiffs must also show that the question "affect[s] at least one" disputed "element" of the class's claims. *Doster*, 54 F.4th at 430. To conduct a rigorous analysis, the court must "walk through each cause of action, identify the relevant elements, and evaluate which elements, if any, submit to common answers." *Nissan*, 122 F.4th at 246–47.
>
> That leads to **_step two_**: ensure that the common questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The court must "put the common issues on one side, the individual issues on the other, then qualitatively evaluate which side predominates." *Nissan*, 122 F.4th at 252 (quotation omitted). If adding or subtracting plaintiffs from the class substantially varies the "substance or quantity of evidence offered" and the cost of doing so, see Fed. R. Civ. P. 23(b)(3), the individualized questions likely overwhelm the common ones. *Brown*, 817 F.3d at 1235.

*Speerly,* 2025 WL 1775640, at *4–*5 (emphasis added).  As explained below, Plaintiffs have met both steps.

11

### a. Plaintiffs Have Identified A Common Question of Law or Fact.

Under Rule 23(a)(2), common questions of law or fact must exist.  Courts agree that "[e]ven a single [common] question" is sufficient to satisfy Rule 23(a)(2).  *See Hicks v. State Farm Fire and Cas. Co.*, 965 F.3d 452, 458 (6th Cir. 2020) (quoting *Dukes*, 564 U.S. at 359).

Here, Plaintiffs and Class members all had a common relationship with Liberty as members and each paid funds for a fraudulent and worthless product.  Each Class member would have purchased Liberty health plans, demonstrating common questions of law and fact.  *See* ¶146 (listing common questions of fact and law).

The underlying legal issues remain the same because Liberty's standardized membership enrollment applications and decision guides are substantially uniform as to the material provisions, and Defendants' alleged misconduct uniformly impacted each Proposed Class member in that each Class member paid funds in exchange for valueless healthcare coverage.  Exs. 2– 6.  Plaintiffs seek class damages that are the result of the class-wide injury suffered by Liberty members upon their purchase of fraudulent and worthless healthcare plans from Liberty.  Indeed, absent the relatively simple calculation of damages based on the total contributions of each Class Member, no individual questions are present.  Although Class members joined or left Liberty at different times, the only individualized exercise is the ministerial task of calculating each member's pro-rata share of the class recovery.  *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) ("[T]he mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.").  These damages stem from each Defendant's role in creating the legal liability that attached upon remittance of funds.  *In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 861 (6th Cir. 2013) ("Because "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal

12

. . . in the mine run of cases, it remains the 'black letter rule' that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members.") (internal quotation marks and citations omitted); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013).

The "commonality" requirement is met for each of Plaintiffs' claims on behalf of the Class because each claim sought to be certified here presents at least one common question of law and fact that would determine each claim in one stroke. *Helwig v. Concentrix Corp.*, 345 F.R.D. 608, 620 (N.D. Ohio 2024) (Ruiz, J.) ("Where there is commonality, the determination of the truth or falsity of this question would resolve the central issue necessary to determine each claim in one stroke."). The answer to whether commonality has been shown "does not turn on whether the district court wrote a long opinion or held multiple hearings. It turns on whether the court examined the material elements of each claim and determined which ones, if any, yield a common answer." *In re Nissan,* 122 F.4th at 246. To satisfy this requirement, Plaintiffs "at a minimum must show that the action will 'resolve an issue that is central to the validity of each one of the claims.'" *Id.* at 246–47 (citing *Dukes*, 564 U.S. at 350) (requiring courts analyzing commonality under Rule 23(a)(2) to "walk through each cause of action, identify the relevant elements, and evaluate which elements, if any, submit to common answers"). Courts must also consider the extent to which the law underlying the claims of a putative class "differs from jurisdiction to jurisdiction." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996).

### b. Common Questions Predominate Over Any Questions Affecting Only Individual Members

Plaintiffs seek to certify this Class as an opt-out class action under Rule 23(b)(3), which requires that common questions of law or fact predominate over individual questions and that class action treatment is superior to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3).

Although "a party seeking to maintain a class action must 'satisfy through evidentiary proof at least one of the provisions of Rule 23(b)[,]' . . . such 'evidentiary proof' need not amount to admissible evidence . . . ." *Lyngaas*, 992 F.3d at 428–29 (citations omitted).[10]

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U. S. 591, 623 (1997).  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citations omitted).  As demonstrated below, the Amended Complaint's detailed factual allegations meet Rule 23(A)(3)'s predominance requirement on every class-wide theory of recovery.

As discussed below with respect to each claim, "no individualized, class member-by-class member proof is needed[—] the entire class will prove, or fail to prove, its RICO [and other] claims together."  *Williams*, 2014 WL 12652315 at *6.  These common questions can be answered for the whole class without resorting to individualized factual analysis.

### i.  Money Had and Received Against All Defendants

Plaintiffs seek to certify their claim of money had and received against all Defendants. ¶¶166–175.  This claim arises from Defendants' possession of funds belonging to Plaintiffs and the Class of which they have "no right to retain and which defendant is obligated by natural justice

---

[10] *Lyngaas* distinguished *Sandusky Wellness Center, LLC v. ASD Specialty Healthcase, Inc.*, 863 F.3d 460, 470 (6th Cir. 2017), on the grounds that the plaintiff in *Sandusky* "lacked the fax logs to show which individuals actually received the fax." *Lyngaas*, 992 F.3d at 430.  Here, by contrast, Liberty has admitted providing all members of the Class with standardized enrollment applications and decision guides.  Ex. 7, p. 5 (Liberty's Response to Plaintiffs' Request for Admission No. 16). *See Helwig*, 345 F.R.D. at 621 (finding commonality for class existed where individuals received substantially similar emails).

14

and equity to refund."  Order on Defendants' Motion to Dismiss (ECF No. 105) ("MTD Order"), at 16 (quoting *Studco Bldg. Sys. U.S., LLC v. 1st Advantage Fed. Credit Union*, 509 F. Supp. 3d 560, 574 (E.D. Va. 2020) (citations omitted)).  This cause of action is "less restricted and fettered by technical rules and formalities than any other form of action.  It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money which eq aequo et bono belongs to the plaintiff."  *U.S. v. Jefferson Elec. Mfg. Co.*, 291 U.S. 386, 402–03 (1934); *Partners & Friends Holding Corp. v. Cottonwood Mins. L.L.C.*, 653 F. Supp. 3d 344, 349 (N.D. Tex. 2023), aff'd, No. 23-10192, 2023 WL 8649880 (5th Cir. Dec. 14, 2023).

The core elements of a claim of money had and received commonality "is that a plaintiff can prove facts showing that defendant holds money which in equity and good conscience, belongs to plaintiff," which is typically satisfied by showing the money was paid due to a mistake of fact, fraud, duress, extortion, or for lack of consideration.  *See State Farm Fire & Cas. Co. v. Evans*, 956 So. 2d 390, 392–93 (Ala. 2006) ("A survey of the law of other states shows that their laws on the subject of unjust enrichment and money had and received are the same or very similar to the law of Alabama, and the court finds that any slight variations that may exist should not be destructive of class certification because such variations can be overcome at trial by grouping similar state laws together and applying them as a unit.").  The prevailing trend across jurisdictions is to integrate this historical claim into the modern framework of unjust enrichment, focusing on the substantive injustice of a defendant's retention of a benefit at a plaintiff's expense.  Ex. 8 (nationwide survey of the laws of the states regarding money had and received); *Walker v. Cedar Fair, L.P.*, No. 3:20-cv-2176, 2023 WL 4564390, at *6 (N.D. Ohio July 17, 2023) (seeing "no relevant analytical distinction between the two claims" of unjust enrichment and money had and received under Ohio law).

15

Even without the benefit of merits discovery, Plaintiffs have attached hereto significant and reliable evidentiary proof showing each defendant received funds rightfully belonging to Plaintiffs and the Class that in equity and good conscious should be returned.[11]  In fact, Defendants ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████.[12]  Plaintiffs allege that

---

[11]  Tax documents show the intake of Plaintiffs and the Class' money and demonstrate the interlocking, self-dealing relationships between Defendants.  Liberty Healthshare, Inc. Form 990 for 2013-2014 (Exs. 9–12); The National Coalition of Health Care Sharing Ministries, Inc. Form 990, 990-PF, and 990-EZ for 2015-2018 (Exs. 13–18); Gospel Light Mennonite Church Medical Aid Plan, Inc. Form 990 for 2015-2023 (Exs. 19–27).

[12]

it would be unjust and improper to allow the Defendants to retain the money Plaintiffs and Class members directly or indirectly conferred to them and that Defendants should not, in equity and good conscience, be permitted to keep the funds of Plaintiffs and the Class members, and instead the funds should be returned to Plaintiffs and the Class members. ¶¶166–175. Thus, the primary common question of law and fact presented by this claim is whether it would be just and proper, in equity and good conscience, to allow Defendants to retain the money Plaintiffs and Class members conferred to Defendants as a result of their role in selling fraudulent and worthless health plans. This key liability question does not require any individualized factual analysis—the focus is exclusively on the Defendants' conduct. The transactions are fixed and uniform among the Class: money was obtained from Plaintiffs and the Class in exchange for fraudulent and worthless health plans.

### ii.  Unjust Enrichment against Defendant Liberty

Plaintiffs' unjust enrichment claim is premised on the fact that the fraudulent health plans marketed by Liberty as HCSMs are worthless to everyone who purchased them because Liberty's plans fail to provide an effective alternative to health insurance—the "sole purpose" of the agreement—and otherwise lacked mutuality of obligation.[13] *James G. Davis Constr. Corp. v. FTJ, Inc.*, 298 Va. 582, 593–94, 841 S.E.2d 642, 648 (2020) (under Virginia law, parties are entitled to

---

███████████████████████████████████████████████████████████████████

[13] *See also* ¶6 (alleging former Liberty CEO Defendant Bellis appeared in a video segment entitled "Will my bills be paid?" and stating: "[w]e've had a successful history of sharing medical bills 100% for every eligible need ever submitted. . . . [s]o it doesn't depend upon a written contract where we can sue each other if someone doesn't send the share amount, it's really a contract written on our hearts."); Defendant Dale E. Bellis' Answer to Plaintiffs' First Amended Complaint, ECF No. 108, at PageID #: 1985, ¶6 (admitting: "The allegations in paragraph 6 of the [Amended Complaint] refer to a YouTube video, which speaks for itself, and Defendant refers to the video for its content, and denies any allegations inconsistent therewith. . . .").

restitution if a contract lacks consideration, as demonstrated by the trial court's ruling that the joint check agreement between two parties was not a binding contract due to lack of consideration).  In fact, in the Affidavit of Liberty's current CEO Dorsey W. Morrow, filed June 9, 2025 in the matter of *Gospel Light Mennonite Church Medical Aid Plan et al. v. New Mexico Office of the Superintendent of Insurance et al.*, No. 1:23-cv-00276-MLG-KK (N.M. Dist. Ct.) (ECF No. 160-7) ("Morrow Aff.") (*see also* Ex. 59), Mr. Morrow swears to the following:

> Under the Legal Notices section of the LHS Sharing Guidelines, the following legal notice is provided:
>
> GENERAL LEGAL NOTICE
>
> This program is not an insurance company nor is it offered through an insurance company. This program does not guarantee or promise that your medical bills will be paid or assigned to others for payment. ***Whether anyone chooses to pay your medical bills will be totally voluntary***.

*Id.* at ¶11(n) (emphasis added); ¶11(j) ("Disclaimers are conspicuously provided with ***remarkable redundancy*** in multiple places in LHS literature and documents, such as the ***Decision Guide, Sharing Guidelines, membership card, LHS website and membership application documents***, making it abundantly clear that LHS ***is a health care sharing ministry*** and not an insurance company and that ***it does not guarantee payment of medical costs***.") (emphasis added); ¶11(k) ("LHS's role is to enable self-pay patients to help fellow members through ***voluntary financial gifts***.") (emphasis added).

In short, Liberty disclaims any responsibility to provide members anything in exchange for the vast sums it collected from Plaintiffs and the Proposed Class.  *Id.*  As such, Liberty's healthcare plans, as an alternative to health insurance, "work[] for *no one*" because they are premised on members of the Class purchasing a legitimate alternative to healthcare coverage for "sharable" medical expenses for which Liberty has no obligation to reimburse.  *Rikos*, 799 F.3d at 523–24

18

(citing *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 412 (S.D.N.Y. 2015) (holding that a "full compensatory damages model, under which consumers would receive a full refund for their purchases of EZ Seed[,] . . . matches plaintiffs' first theory of liability—that EZ Seed does not grow grass, and is thus valueless" due to its alleged failure to perform as advisertised, and therefore "satisfies *Comcast* because it measures damages properly if EZ Seed is valueless") (internal quotation marks omitted)).  A full refund for each class member is appropriate because there was no reason to buy Liberty's plans except for their purported benefit as a qualified HCSM offered as an alternative to health insurance.  "The question [is] whether the class 'can prove—not that [they] have already shown—that all members of the class have suffered the same injury.'"  *Uselmann v. Pop*, No. 19-cv-13652, 2023 WL 584123, at *4 (E.D. Mich. Jan. 27, 2023) (quoting *Rikos*, 799 F.3d at 505) (citation and quotation marks omitted)).

Consistent with this commonality, Liberty's membership applications and decision guides are unenforceable contracts.[14]  ¶177.  The standardized contract language at issue in Liberty's standardized materials does not vary by individual class member.  *See* Morrow Aff.  Neither does the applicable legal standard for unjust enrichment in the absence of an enforceable contract is not materially differ across state jurisdictions.  *See* Ex. 60 (survey of unjust enrichment law).

---

[14] If Liberty's health plans did provide any sort of (i) assumption of risk or promise to pay among the members and (ii) assumption of risk or promise to pay by the organization to the members, which, as discussed, Liberty denies, Liberty's health plans would be illegal insurance contracts pursuant to, *inter alia*, VA ST § 38.2-6300 (defining "health care sharing ministry" as "a health care cost sharing arrangement among individuals of the same religion based on their sincerely held religious beliefs," providing that, *inter alia*, that "amounts that members/subscribers may contribute with (i) no assumption of risk or promise to pay among the members and (ii) no assumption of risk or promise to pay by the organization to the members[.]"); VA ST § 38.2-6301 (a health care sharing ministry that meets the definition of VA ST § 38.2-6300 "shall not be considered to be engaging in the business of insurance[.]").

If Liberty's health plans do not constitute enforceable contracts, equity will require Liberty to pay restitution for the premiums received from Plaintiffs and Class members.  ¶186.  Whether Liberty's health plans are unenforceable contracts, and, if so, whether equity requires that Liberty pay restitution of the amounts paid by Plaintiffs and Class members to Liberty, are additional issues common to each member of the Proposed Class.

### iii.  Civil RICO against Liberty, MCS, Cost CSS, SavNet, and Daniel J. Beers

Common issues presented by Plaintiffs' RICO claims include: (i) whether the association between Liberty and the Corporate Defendants furnished a vehicle for the commission of two or more predicate acts; (ii) whether the foregoing association engaged in activities "affecting interstate commerce" within the meaning of 18 U.S.C. § 1962; (iii) whether Defendants' association constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4); (iv) whether any of the Defendants have engaged in mail and/or wire fraud; (v) whether any of the Defendants participated in and controlled the conduct and affairs of a common enterprise through a pattern of racketeering activity; (vi) whether any of the Defendants' corporations, limited liability companies, limited partnerships, and other corporate entities and partnerships constituted enterprises for purposes of 18 U.S.C. § 1961(4); (vii) whether any of the Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs for purposes of 18 U.S.C. § 1962(c); (viii) whether any of the Defendants used or invested income from their racketeering activities to establish or operate their enterprise, in violation of 18 U.S.C. § 1962(a); (ix) whether any of the Defendants conducted or participated in the affairs of their enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c); and (x) whether any of the Defendants' overt and/or predicate acts in furtherance of their violations of 18 U.S.C. §§ 1962(a) and (c) proximately caused injury to Plaintiffs and Class members.  *See* ¶146.

20

There are no material differences between the Circuits that preclude conducting a single national RICO trial in the Northern District of Ohio.  Four elements must be proven: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985); 18 U.S.C. § 1962(c)-(d).  This pattern "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity[.]" 18 U.S.C. § 1961(5).  Plaintiffs' factual allegations may be determined in a single trial without favoring or punishing class members according to their residence, and individual distinctions regarding Defendants' RICO liability do not predominate over the common issues impacting current and former Liberty members identically throughout the class period.

The Sixth Circuit's discussion of *Klay* is "instructive on how classwide circumstantial evidence in this case likely satisfies the individual reliance requirement."  *See Rikos*, 799 F.3d at 518.  Physicians in *Klay* brought a class action alleging that various HMOs had defrauded them, in part based on misrepresentations that the HMOs would reimburse them for medically necessary services plaintiffs provided to the HMOs' insureds.  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004), abrogated in part on other grounds by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008).

> The court explained that "while each plaintiff must prove his own reliance in this case, we believe that, based on the nature of the misrepresentations at issue, the circumstantial evidence that can be used to show reliance is common to the whole class. That is, the same considerations could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations." [*Klay,* 382 F.3d at 1259]. The court noted that the defendant made a uniform representation to class members. *Id.*  And the court explained, "[i]t does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due" because the promise to reimburse was a central reason physicians would sign the agreements. *Id.*  Similarly, in this case the alleged misrepresentation that Align

promotes digestive health is the reason to buy Align. Thus*, a jury could "legitimate[ly] infer[ ] [reliance class-wide] based on the nature of the alleged misrepresentations at issue*." *Id.*

*Rikos*, 799 F.3d at 518 (emphasis added); *Uselmann*, 2023 WL 584123, at *5 (certifying multi-state RICO class predicated on mail fraud where all class members shared the same legal and factual questions regarding (i) whether the defendants defrauded owner-operators who signed uniform and unmodifiable agreements with a defendant; (ii) whether defendants mailed fraudulent statements showing fraudulent gross venue; (iii) whether defendants engaged in fraudulent concealmeant with respect to all class members; and (iv) the "allegedly fraudulent nature of Defendants' conduct and the illegal methods they alleged used to accomplish the goals of the scheme are common contentions capable of class-wide resolution."). Likewise, a jury in this case could also resolve common issues of law and fact and determine this claim by legitimately inferring that Liberty's standardized misrepresentations, including fraudulent concealment later revealed by*, inter alia*, the *ProPublica* articles, were a central reason that members of the Class signed up with Liberty and paid contributions, dues, and/or premiums to Liberty. *Id.*

Subsequent to RICO's passage, the U.S. Supreme Court added the elements of *relatedness* and *continuity* to the pattern requirement. *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 239–40 (1989). The relatedness required is that between the racketeering predicates, and is satisfied by criminal acts linked by having the same or similar victims, perpetrators, results, or methods of commission. *Id.* As for continuity, the RICO predicate acts must prove the "continuity of racketeering activity, or its threat, simpliciter. This may be done in a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity." *Id.* at 241. Although there is no bright line test, the Court offered some guidance to lower courts to assist in determining continuity. Where the predicate acts constitute "a closed period of repeated conduct" a plaintiff

must prove "a series of related predicates extending over a substantial period of time." *Id.* at 241–42.  Because RICO was intended to curtail long-term criminal conduct, "[p]redicate acts extending over a few weeks or months" which pose no threat of future criminal conduct are insufficient to establish closed-ended continuity. *Id.* at 242.  As shown above, Plaintiffs' RICO allegations satisfy the highest standards articulated by SCOTUS and the circuit courts.

Whether this Court certifies the Proposed Class turns on whether Plaintiffs have shown, for purposes of Rule 23(b)(3), they *can* prove—not have *already* shown—that all Class members have suffered the "same injury." *Dukes*, 564 U.S. at 350.  The Proposed Class need not prove at the class-certification stage that all or most Class members were in fact injured.  Rather, they must show the RICO claim "depends upon a common contention" that is of such a nature it is capable of class-wide resolution (i.e. its truth or falsity will resolve an issue that is central to the validity of its RICO claim in one stroke). *Id.*  In other words, the named plaintiffs must show there is a common question that will yield a common answer for the Class (to be resolved later at the merits stage), and that that common answer relates to the actual theory of RICO liability.

Since *Dukes*, the Supreme Court has made clear that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466; *see Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012).  Once merits discovery commences, Defendants' actions, internal documents, and testimony of their own officers, current and former employees and other co-conspirators will provide common proof to establish liability for all Class members' claims.  Thus, the very facts that form the underlying basis of Plaintiffs'

claims not only predominate but are in fact identical to the claims held by each member of the Class, collectively and singularly.

The Hon. Dan Polster of this Court recently concluded "it is not surprising that many courts within this Circuit have found that common issues predominate in the adjudication of specific RICO claims." *In re Nat'l Prescription Opiate Litig.*, 332 F.R.D. 532, 550 (N.D. Ohio 2019), *rev'd on other grounds*, 976 F.3d 664, 673–74 (6th Cir. 2020) (reversing certification of a negotiation class for settlement purposes).  Judge Polster's color-coded chart[15] contrasts RICO's common elements of proof in blue against the sole individual element in orange:



RICO ELEMENTS: COMMON (BLUE) vs INDIVIDUAL (ORANGE)

---

[15] *See In re Nat'l Prescription Opiate Litig.,* 332 F.R.D. at 549.

Judge Polster then observed: "As is visually evident, there are a host of issues and sub-issues within the RICO claims.  As applied to Plaintiffs' allegations concerning the existence of two national enterprises that disseminated a set of standard falsehoods in marketing and distributing opioids, all of the elements except injuries are common, not individual. Many courts have so held in similar circumstances." *In re Nat'l Prescription Opiate Litig.,* 332 F.R.D. at 549 (collected cases omitted).

Here, the following misrepresentations, documented in the attached *ProPublica* articles (Exs. 61–63 hereto), would have been critical for prospective members to know before signing up for Liberty health plans, as they directly impacted the reliability and integrity of the organization, but were not, and are still not, disclosed by Liberty in its standardized membership applications or decision guides distributed to Class members (Exs. 2–6 hereto):

- "A Christian Health Nonprofit Saddled Thousands With Debt as It Built a Family Empire Including a Pot Farm, a Bank and an Airline," *ProPublica*, Feb. 25, 2023 (Ex. 61 hereto)

    o Liberty members were unaware that their payments were being directed to a family with a history of fraud, specifically the Beers family, who had previously been involved in a fraudulent health care sharing ministry scheme in the 1990s.

    o The Beers family used Liberty funds to enrich themselves, funneling money through a network of shell companies to purchase various businesses and properties, including a private airline and a marijuana farm, rather than using the funds to pay members' medical bills.

    o Despite being a central figure in Liberty's operations, Daniel J. Beers was not officially listed as an executive or board member, allowing him to disguise his involvement and avoid accountability.

    o Liberty failed to pay medical bills for its members, leading to significant financial distress for many, including former Plaintiff Bonnie Martin (now deceased), who was left with $10,000 in unpaid charges despite initially having her bills covered.

    o The organization was involved in dubious accounting practices, failing to report over $1 billion in payments to tax agencies and using software to create "hypothetical accounts" that misrepresented the financial transactions to members and regulators.

- o Liberty's contracts with companies owned by Beers family members and associates, such as Medical Cost Solutions and Cost Sharing Solutions, were not disclosed to members, and these companies derived all their revenue from Liberty, raising concerns about conflicts of interest and self-dealing.

- o The Beers family and their associates were involved in a pattern of self-enrichment and financial mismanagement, which led to a backlog of unpaid medical bills and numerous complaints from members who were harassed by bill collectors.

- o Liberty's marketing and operational practices were misleading, as they promised lower costs and compassionate care but failed to deliver, leaving many members in debt and financial ruin.

- "How Obamacare Enabled a Multibillion-Dollar Christian Health Care Cash Grab," *ProPublica*, March 9, 2023 (Ex. 62 hereto)

  - o Liberty was founded by individuals previously involved in a scandal with the Christian Brotherhood Newsletter, where leaders enriched themselves instead of paying members' medical bills.

  - o Despite denials, Defendant Daniel J. Beers, a key figure in the previous scandal, was found to have significant influence over Liberty HealthShare, although his name does not appear on official documents.

  - o Liberty members were left with tens of millions of dollars in unpaid health bills while some of the founding family members became wealthy.

  - o The involvement of Beers and his family in Liberty HealthShare was an open secret within the industry, raising concerns about the ethical management of the ministry.

- "The Shadowy Financial Empire Built Around Liberty HealthShare Is Showing Signs of Strain," *ProPublica*, May 15, 2023 (Ex. 63 hereto)

  - o Liberty HealthShare was marketed as a Christian nonprofit offering an affordable alternative to traditional medical insurance, but it was controlled by the Beers family, who used the funds to build a financial empire rather than ensuring members' medical bills were paid.

  - o The Beers family funneled at least $140 million to vendors owned by family members and friends, depleting Liberty's finances and leaving thousands of members with unpaid medical bills.

  - o Despite claims of charging market rates, the family-owned vendors, Cost Sharing Solutions and Medical Cost Solutions LLC, were involved in financial practices that led to Liberty's financial strain.

26

o   Liberty severed ties with the Beers family as part of a settlement with the Ohio attorney general's office in 2021, indicating prior issues with the family's management.

o   The Beers family faced significant financial liabilities, including liens for millions in back taxes and a $5 million settlement with the Ohio attorney general's office, which could impact their ability to manage Liberty effectively.

o   The Beers family received over $6.3 million in COVID-19 relief funds, most of which were forgiven, raising questions about the financial management and transparency of the conglomerate.

The reliability of the facts asserted in the *ProPublica* articles is bolstered by a preceding *ProPublica* request to Daniel J. Beers,[16] Brandon Fabris, Thomas Frab, Dan "Danny" Beers Jr., and Ronnie Beers (Ex. 64), which appears to have provided the Beers family with an opportunity to refute the allegations later published in the *ProPublica* articles.  The request states the Beers family "extracted at least $120 million from the health care sharing ministry through for-profit vendors they own, using exclusive contracts they effectively awarded to themselves." This amount was determined from interviews, Liberty's IRS Form 990s,[17] internal audits,[18] and leadership

---

[16]  Although Beers Sr. is not officially listed on company filings, the *ProPublica* request details how he and his family "controlled Liberty from its founding through 2021," citing his own admissions, taped event statements (2019 CPAC), and detailed knowledge of company operations. Numerous interviews and records (including business cards, emails, photos, and third-party statements) are cited to confirm that both Beers Sr. and Fabris acted as Liberty managers and representatives, contradicting any claimed "arm's length" relationship.  Business cards, internal and external communications, and personal accounts from individuals working across family businesses reinforce Beers Sr.'s operational control and involvement in day-to-day management.

[17]  In the request, Liberty is accused of obscuring more than $1 billion in revenue from the IRS by omitting the majority of its receivables from the balance sheet and instead placing them in a hidden text field, making the organization appear far smaller than it was.  *ProPublica* found no evidence that members controlled these funds, contrary to Liberty's representations.  Experts and a former IRS division head (Marcus Owens) are cited, stating that Liberty likely misclassified its cash flow and that all such money should be reported as revenue based on control over the funds.

[18]  Fabris and others reportedly confirmed that Liberty kept "two sets of financial accounts," using software to simulate individual member accounts, further illustrating lack of financial transparency.  Employees described a chaotic, paper-check reconciliation process, reinforcing claims of poor internal controls.

admissions,[19] all referencing excessive fees for services that "many health care sharing ministries manage in-house at a lower cost."  These funds[20] were funneled out through a network of companies controlled by family members, corroborating allegations of large-scale diversion of nonprofit resources. documents financial mismanagement, details the central and active involvement of the Beers family (contrary to their denials), and describes consistent patterns of misleading practices[21]—both historic and current.  Defendants CSS and MCS[22] are specifically

---

[19]  The admissions of Dr. John Hunt, stated in the attached complaint to the Ohio Attorney General and made in his capacity as Chief Medical Officer of Liberty (the "Hunt Complaint"), further corroborate the *ProPublica* articles.  Ex. 65.  The Hunt Complaint directly supports and expands on key allegations reported in *ProPublica*'s investigations of Liberty, particularly regarding financial mismanagement, extensive involvement and profiteering by the Beers family and related associates, misleading and retaliatory practices targeting whistleblowers, a governance structure dominated by conflicted insiders, and a consistent prioritization of personal and familial financial interests over the nonprofit's mission and member wellbeing.  Examples cited include approximately "$1 million/month to Douglas Behrens (Sav-Net), for a drug discount and dental discount card contract that provides the membership what they could get for free from numerous other sources."  There is also reference to "roughly $500,000 profit per month to Tom Fabris (owner of Medcost Solutions . . .provides certain billing-related services to Liberty Healthshare)," noting this figure is believed to be Fabris's "individual monthly profit."  The Hunt Complaint specifically details active suppression of whistleblowers, including the firing of the general counsel "in temporal association with our joint efforts to increasingly insist that [Defendants] [Bellis] (CEO) and [Abel] (COO) recognize the necessity to address the conflicts of interest and fix the excess benefit being supplied to the conflicted for-profit vendors."  The Hunt Complaint further states that "CSS (which is owned by Dan Beers's family)" is a primary vendor to Liberty.

[20]  The software-based "hypothetical" accounting presented to Limembers is portrayed as misleading, giving the appearance of individualized accounts while masking the pooling and control of funds by management.

[21]  For example, the request states Liberty and MCS deliberately sent members' unpaid medical bills to collections as a cost-saving strategy, with admissions by involved executives, and subsequent reversal of policy only after member hardship was evident.  Expansion of business and real estate dealings, described as being funded by assets originating from Liberty members' payments, continued even as member bills went unpaid and the nonprofit verged on collapse.

[22]  Liberty is described as having paid large, year-end lump sums to family-owned vendors—$17.8M, $25.2M, and $19M in 2017-2019, which "contradict the argument that CSS is paid commensurate to member growth and retention." The lack of supporting contracts or accounting for these transactions is highlighted, directly supporting *ProPublica*'s reporting of questionable financial practices.  The document also describes a real estate transaction where a building

28

identified as the beneficiaries of these contracts. Much of this corroboration is drawn from internal records, IRS filings, executive and whistleblower statements, and audit/transaction data referenced or described within the document. This breadth and detail of evidence directly bolster the credibility and accuracy of the issues raised in the *ProPublica* articles.

The RICO claims asserted by Plaintiffs on behalf of the Class are thus based on the same common allegations: that Liberty has engaged in a RICO enterprise with Daniel J. Beers and the Corporate Defendants by misrepresenting the nature of its fraudulent and worthless health plans through standardized misrepresentations, by secretly funneling unwarranted payments to other Defendants, and by concealing these payments from members of the Class. "These contentions, which are common to every single member of the proposed class, will generate common answers that necessarily will drive resolution of this lawsuit." *Williams*, 2014 WL 12652315, at *6 (certifying RICO claims alleging Duke Energy committed fraud against all of its ratepayers) (citing *Dukes*, 564 U.S. at 349–50).

Offenses constituting "racketeering activity," as defined in § 1961(1), include mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. Here, Liberty's healthcare plans are designed to look and operate as much like health insurance as possible. ¶3. Plaintiffs and Class members purchased Liberty's plans and paid periodic premiums, reasonably believing that Liberty was a legitimate HCSM and its plans were legitimate alternatives to health insurance, rather than shams designed to avoid federal and state insurance oversight and permit Defendants to loot Liberty's members' funds; that the premiums would be used by Liberty to fund payment for members' medical expenses; and that Liberty would pay those medical expenses. ¶249; *see also* Declarations

---

purchased for $650,000 by CSS was sold two weeks later to Liberty for $1.6 million—a nearly $1 million profit.

of Plaintiffs (Exs. 66–68 hereto).  As a proximate result of Liberty's materially false and misleading misrepresentations and material omissions, Plaintiffs and the Class suffered damages, including many millions of dollars in misappropriated contributions, as well as unreimbursed medical expenses.  ¶250.  As the Court has previously found, "[t]he Amended Complaint sufficiently alleges that the purported class paid contributions, dues, and/or premiums into a pool for which there was an expectation that they would receive money from that pool for medical costs incurred if the need arose."  MTD Order at 15.

Liberty undertook a comprehensive marketing strategy with a generally uniform core message such that all Class members were likely exposed to the alleged misrepresentation.  At a minimum, all members of the Class received Liberty's standardized enrollment applications and decision guides.  Ex. 7, p. 5 (Liberty's Response to Plaintiffs' Request for Admission No. 16); Exs. 2–6 (standardized membership enrollment applications and decision guides); *see Helwig*, 345 F.R.D. at 621 (finding commonality for class existed where individuals received substantially similar emails); *Klay*, 382 F.3d at 1258 (certification is appropriate even where defendants engage in a variety of communications, as long as the communications "conveyed essentially the same message.").

In sum, the common issues that predominate are Defendants' alleged racketeering activities and conspiracy to defraud Plaintiffs and the Class.  As detailed in the Amended Complaint and the *ProPublica* articles, all of Plaintiffs' claims (and that of the Class) flow from Defendants' common RICO enterprise, fraudulent acts, and conspiracy in furtherance of a common criminal scheme.  *See* ¶¶187–215 and Exs. 61–63.  These questions predominate over possible individual questions since the alleged wrongful conduct was the same with respect to all Class members.  "[A] single conspiracy and fraudulent scheme against a large number of individuals . . . is particularly

30

appropriate for [a] class action." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 (11th Cir. 1987) (citation omitted).

### iv. Conversion Against All Defendants

The core elements of the cause of action of conversion common to all states include (i) ownership or right to possession of identifiable or segregated funds; (ii) wrongful appropriation of the funds; (iii) a causal link between the defendant's acts and the plaintiff's loss or injury; and (iv) damages as a result of the conversion. Ex. 69 (50-state survey of conversion law). Applying these elements to Plaintiffs' allegations, the standard for determining Defendants' liability for unlawful conversion does not materially differ from state-to-state: (1) Liberty acquired possession of Plaintiffs' and Class members' premiums, (2) for a self-serving purpose that was contrary to Plaintiffs' and Class members' authorization, (3) in order to deprive Plaintiffs and Class members of their property rights, (4) so Defendants could enrich themselves, (5) by inflating the "administrative fees" or otherwise secretly converting Class members' funds for Defendants' personal gain, and (6) without Plaintiffs and Class members' knowledge or consent. Because Defendants' use of the contributions appeared consistent with their intended use, Plaintiffs were unaware of Defendants' actual scheme before retaining Class counsel.

Virginia's conversion law, which targets the wrongful control or exercise of dominion over property belonging to another in a manner that violates the owner's rights, provides a fitting illustration. MTD Order at 13–14 (citing *Mackey v. McDannald*, 298 Va. 645, 842 S.E.2d 379, 387 (2020) (citation omitted, cleaned up); *Student A v. Liberty Univ., Inc.*, 602 F. Supp. 3d 901, 914 (W.D. Va. 2022); *NorthStar Aviation, LLC v. Alberto*, 332 F. Supp. 3d 1007, 1020 (E.D. Va. 2018) ("A segregated or identifiable fund is one separate from the defendant's general funds and one to which plaintiff is entitled.") (citation omitted)); *Baltimore & Ohio Railroad Co. v.*

31

*O'Donnell*, 49 Ohio St. 489, 32 N.E. 476 (1892); *In re Williams*, 233 B.R. 398, 402 (Bankr. N. D. Ohio 1999).

As this Court previously found, "[t]he Amended Complaint sufficiently alleges that the purported class paid contributions, dues, and/or premiums into a pool for which there was an expectation that they would receive money from that pool for medical costs incurred if the need arose. Defendant Liberty denies being an insurer, therefore, the money collected is arguably not part of general operating funds of an insurer, but rather money segregated or set aside for the benefit of Liberty's members—the purported class." MTD Order at 15. Upon completion of merits discovery, Plaintiffs expect the evidence to show the precise amounts Defendants siphoned from monthly premiums throughout the proposed class period pursuant to their conspiracy. Plaintiffs also expect to show where the funds were deposited and who benefitted from each transaction. Because Plaintiffs' equitable relief is tied to Defendants' unlawful conversion, the common law applicable in each state will permit the recovery of these converted funds.

### 3. Plaintiffs' Claims are Typical of the Claims of the Class

Rule 23(a)(3) also requires that Plaintiffs demonstrate that the claims of the named representatives are typical of claims of Class. Fed. R. Civ. P. 23(a)(3). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Powers*, 501 F.3d at 618 (quoting *Am. Med. Sys.*, 75 F.3d at 1082) (internal quotes omitted)). This requirement ensures that this Court may properly attribute a collective nature to the challenged conduct. *Id*. "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th. Cir. 1998). The representative's interests must be aligned with those of the representative group such that the representative's pursuit of its own claims advances the interests of the class. *Id*.

Here, Plaintiffs and the Class are pursuing the same legal theory.  There is no material variation in the fact patterns among the claims of the Class.  Each Class member's claim, just like Plaintiffs', is identical in that the sole question is whether Defendants' respective wrongful conduct violated any of the laws complained of herein.  ¶145.  Each Class member's claim, just like Plaintiffs' claims, is identical inasmuch as the question to be decided is whether they paid monthly contributions to purchase a fraudulent and worthless health plan designed, marketed, sold, and/or administered by Defendants.  ¶¶16–18.  Each Class member received standardized membership applications and decision guides.  Ex. 7, p. 5 (Liberty's Response to Plaintiffs' Request for Admission No. 16).  This common course of conduct can be reviewed by this Court under a common legal theory and will allow the adjudication of this case on behalf of the entire Class. Because the Proposed Class representatives seek to prosecute the exact same claims for themselves and for the absent Class members, under identical legal theories, typicality is established.

No conflict between the named Plaintiffs and the Class would affect typicality.  Defendants' conduct as to each Class member is the same, as are the legal theories underlying their claims. The claims asserted by Plaintiffs in the Amended Complaint are typical because what is needed to prove improper collection of funds from Plaintiffs is the same as to establish the improper collection of funds paid by all Class members.  3 William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 3:29 (5th ed. 2011).  The typicality requirement is thus satisfied.

### 4.  Plaintiffs Are Adequate Class Representatives Who Will Continue to Vigorously Prosecute the Interests of the Class Through Qualified Counsel.

Rule 23(a)(4) requires that the class representative, "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The Class representative(s) may not have interests antagonistic to the absent Class members and the representative party's attorneys must be qualified, experienced, and generally able to conduct the litigation.  *In re Welding Fume Prods.*

33

*Liab. Litig.*, 245 F.R.D. 279, 298 (N.D. Ohio 2007); *Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1031 (6th Cir. 1977). Like the rest of the Class, Plaintiffs fell victim to Defendants' fraudulent scheme. Plaintiffs' actions to date demonstrate that they will each take their responsibility as Class representatives seriously and that they are ready, willing and able to prosecute this action on behalf of the Class vigorously. *See* Exs. 66–68 hereto.

Here, Plaintiffs and their competent and experienced counsel do not have any conflicts of interest with other Class members. There is nothing that suggests that there are conflicting or antagonistic interests here. To the contrary, the named representatives share a stake in whether the Defendants will be forced to pay the compensation that was fraudulently confiscated. Further, they share an interest in ensuring justice is obtained from the perpetrators of this enterprise. Plaintiffs have demonstrated willingness to participate actively in the litigation and to protect the interests of the unnamed Class members. Plaintiffs are similarly situated to the members of the Proposed Class and there is no reason to doubt that they will fairly and adequately protect the interests of the Class.

Rule 23(g) complements Rule 23(a)(4)'s requirement that class representatives will adequately represent the interest of Class members by focusing on the qualifications of Class counsel. Plaintiffs' counsel has a reputation for competency, experience, skill, and resources in handling class actions and other complex litigation. *See* Exs. 70 (firm resume of Johnson Fistel, PLLP); 71 (firm resume of The Law Office of George W. Cochran). Plaintiffs' counsel has dedicated and will continue to dedicate high levels of legal skill and resources to the vigorous prosecution of this class action litigation. Counsel firmly believes that this Court will find that there is nothing to suggest that the named Plaintiffs are not able to prosecute this case vigorously, or that Class counsel is not competent to do so.

34

### C.  A Class Action Is Superior to Numerous Individual Actions.

Class certification offers judicial efficiencies permitting common claims and issues to be tried only once, with a binding effect on all parties. It also avoids the possibility of inconsistent adjudications and facilitates settlement by permitting agreements binding all potential claimants. Rule 23(b)(3) lists the following non-exclusive factors as to the superiority requirement:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).  *See also Amchem*, 521 U.S. at 615–16.

The first and second factors address whether the interest of Class members in conducting separate lawsuits is so strong as to require denial of Class certification, as well as consideration of the extent and nature of any existing litigation as to the controversy already commenced by or against members of the Class.  The damages suffered by individual Class members are relatively small compared to the burden, expense and complexity of individual prosecution of the potentially extensive litigation necessitated by the conduct of the Defendants.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court.  Plaintiffs are not aware of any other cases filed prior to the current litigation contending that the Defendants' conduct warrants damages equal to the contributions collected by Liberty.  Finally, individual litigation of the common legal and factual issues raised by the Defendants would increase delay and expense to all parties and to the Court.  In sum, it would be "a waste of the Court's resources to separately litigate claims that all pertain the same scheme and uniform course of conduct.  And the amount of individualized inquires can be effectively minimized."  *Uselmann*, 2023 WL 584123, at *11.

The third superiority factor is the desirability of conducting the litigation in a particular forum.  It is desirable to litigate these claims in this forum as many of the Defendants either reside in Ohio or maintain (or once maintained) offices in the Ohio area, and another federal court already found this forum to be more appropriate when transferring related litigation from South Carolina to this forum.  The fourth and final Rule 23(b)(3) factor is "the difficulties likely to be encountered in the management of a class action."  *Amchem*, 521 U.S. at 616.  Management of this case as a class action presents no unusual difficulties. Class actions of this size are common and present no major management problems.

The superiority requirement asks this Court "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication."  *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 290 (S.D. Ohio 1997).  Certification of this Class is a superior method for the fair and efficient adjudication of this controversy.  All of the Class members' damages were caused by a single course of conduct: the Defendants' conduct in violation of RICO and/or common law.  Given Defendants' common course of conduct and the identical nature of Plaintiffs' and the Class's claims flowing therefrom, a Class will be managed by the Court and the parties with ease.  Finally, "[b]ecause of Defendants' alleged fraudulent concealment, many class members may not discover that they have a cause of action until they learn about this lawsuit."  *Uselmann*, 2023 WL 584123, at *11.  As such, the proposed Class satisfies Fed. R. Civ. P. 23(b)(3).

## V.    CONCLUSION

Each Class member was the victim of a well-orchestrated fraudulent enterprise and suffered losses as a result.  Defendants' actions in planning and carrying out Defendants' well-orchestrated scheme is the overwhelming bond that unites Plaintiffs and Class members, and as a result, this

case presents an ideal opportunity to use class certification to simplify, streamline, and economize judicial resources and best enable each victim to recover their damages.

Respectfully submitted,

Dated: July 29, 2025

**JOHNSON FISTEL, PLLP**

By: _/s/ Michael I. Fistel, Jr._
MICHAEL I. FISTEL, JR.
WILLIAM W. STONE
OLIVER S. TUM SUDEN
40 Powder Springs Street
Marietta, Georgia 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com
WilliamS@johnsonfistel.com
OliverT@johnsonfistel.com

**LAW OFFICE OF GEORGE W. COCHRAN**
GEORGE W. COCHRAN (0031691)
1981 Crossfield Circle
Kent, Ohio 44240
Telephone: (330) 607-2187
Facsimile: (330) 230-6136
lawchrist@gmail.com

***Counsel for Plaintiffs and Proposed Class Counsel***

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on July 29, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses noted on the Electronic Mail Notice List.  In addition, the Motion was served by electronic and U.S. Mail to Douglas D. Behrens at the address provided by his counsel:

Douglas D. Behrens
947 W. Waterloo Rd.
Akron, OH 44320
Douglas@aprx.com

                                          */s/ Michael I. Fistel, Jr.*
                                          Michael I. Fistel, Jr.